UNITED STATES of America

v.

Joseph Lee TILLERY.

Crim. No. 71–485.

United States District Court,
E. D. Pennsylvania.

Oct. 4, 1971.

Henry J. Horstmann, Asst. U. S. Atty., Philadelphia, Pa., for government.

Mark D. Schaffer, Voluntary Defender, Philadelphia, Pa., for defendant.

OPINION AND ORDER

MASTERSON, District Judge.

Motion to Suppress. According to agents of the FBI, on June 24, 1971, at approximately 3:05 P.M., a lone gunman robbed a branch of the Fidelity Bank in Ridley Township, Pennsylvania, and took $3,000 including $500 in bait ten dollar bills. During the robbery, one of the tellers was shot in the shoulder.

About fifteen minutes later, Mr. Burke, the owner of a residence located in the immediate vicinity of the bank observed a man carrying a bag and fitting the description of the robber running through a hole in his fence. As he passed, Mr. Burke asked him what was wrong. The man replied, "they are after me." The suspect continued to run, and Mr. Burke saw him get into a 1962 or 1963 Pontiac Tempest with a white top, blue bottom, and flowers on the front hub caps as well as on the passenger's side of the car. This car was driven by another male and had pulled up and parked about 5 or 10 minutes before the man came running through the fence. The auto immediately sped away with its two occupants.

Later that same afternoon, a 1962 Oldsmobile F–85 with a white top, blue bottom and flowers on both the hub caps and passenger's side was stopped by the local police in Chester, Pennsylvania. The driver, Mrs. Scott, a resident of Chester, explained that she had no knowledge of the whereabouts of her car earlier in the day, but her eleven year old daughter Karen indicated that sometime that morning she (Karen) had given the keys to Joseph Tillery, the de-

fendant. Karen further stated that Tillery had returned the car during the afternoon and that he was accompanied by another individual. The following day, an FBI agent showed Karen pictures of the robber taken by a camera inside the bank. She identified the man in the photograph as "Sonny W.," and told the agent that he was with Tillery when the latter returned Mrs. Scott's car.

In the meantime, one of the FBI agents investigating the bank robbery indicated that he too was looking for Joseph Tillery on a bond default warrant issued by a Federal Judge in the District of Columbia. At that point the agents apparently decided to arrest Tillery on the "D.C. Warrant." This warrant has been made a part of the record in this case, and we note that it concerns the offense of carrying a dangerous weapon rather than bond default as the arresting agents had originally thought. Nevertheless, there is no dispute that this was the bench warrant pursuant to which the defendant was ultimately arrested.

Thus, on the afternoon of June 25th (the day after the robbery) six or seven agents went to the vicinity of the home of Tillery's mother in Chester, which was his last known address. At 3:26 P. M., these agents stopped a 1966 Thunderbird and arrested Joseph Tillery, the driver. They made a quick "pat-down" search for weapons and hustled him into their car. According to the agents, a crowd of residents who were aware of the arrest had gathered, and these people hurled various slurs at them. At the suppression hearing, an agent testified that Tillery was informed that his arrest was based on the "D.C. Warrant" mentioned above, and the defendant confirmed this statement.

The agents then transported Tillery to FBI headquarters in Philadelphia where they conducted a "strip-search". This procedure involves a complete search of the arrestee's person, and in the process all items of clothing are removed and thoroughly searched. During this search, agents found a ten dollar bill

which matched one of the serial numbers of the bait money stolen on the previous day from the Fidelity Bank. As a result of this information, an indictment was filed against Joseph Tillery on August 5, 1971 charging him with bank robbery and incidental crimes under 18 U.S.C. § 2113. His alleged accomplice William James Smith, a.k.a. "Sonny W," has not yet been apprehended.

Defendant now moves to suppress the bait ten dollar bill found in his pocket based on the following theories:

(1) The "D.C. Warrant" was a sham for arresting the defendant and searching him for bait money relating to the bank robbery.

(2) Even if the "D.C. Warrant" was valid, nevertheless, evidence seized incident to an arrest for one offense cannot be used to prosecute the defendant for an unrelated offense.

(3) Even if the evidence seized incident to an arrest can be so used, in this case the bait money must be excluded because (a) the scope and delay in the strip search was unreasonable, and/or (b) assuming the legality of such a *search*, nevertheless, the agents lacked probable cause to *seize* the ten dollar bill in question.

(4) Since the legality of the arrest and search cannot be predicated upon the "D.C. Warrant," the government must rely upon the validity of an arrest for bank robbery in order to introduce the bait money. And as to the bank robbery charge, the agents lacked probable cause when they arrested the defendant.

(5) Even if the agents had probable cause, their failure to secure an arrest warrant when they had time to do so renders the arrest on that charge unlawful, and any evidence seized incident thereto must be excluded as poisonous fruit.

After careful consideration, we have concluded that the bait money found on the defendant in the search at FBI headquarters was lawfully seized incident to defendant's arrest on the "D.C.

Warrant." Accordingly, we find it unnecessary to decide whether the agents had probable cause to arrest Tillery for bank robbery before they found the ten dollar bill. Moreover, we need not face the more difficult issue of whether under the circumstances an arrest warrant for bank robbery was necessary even if the officers had probable cause.

Defendant's claim that the "D.C. Warrant" was a sham to enable the agents to search him for bait money has no merit. The case he relies upon, Taglavore v. United States, 291 F.2d 262 (9th Cir.1961), is clearly distinguishable from this case. In *Taglavore*, the police arrested the defendant's employer on a narcotics charge. They further suspected that the defendant, who drove one of his employer's cabs, had something to do with that violation. But instead of arresting Taglavore for a narcotics offense, the officer arrested him on a warrant for two minor traffic violations—failing to signal for a right turn and having faulty brake lights. A police inspector whose information formed the basis for the warrant later testified that he had observed these traffic violations the previous night, but was too busy at the time to take any action. The inspector also informed his underlings that there was an excellent chance that the defendant would possess marihuana when they found him. Five minutes later, these officers did find him, and a search incident to that arrest turned up the remains of a marihuana cigarette. Such an arrest by the members of the vice squad for a minor traffic violation was so extraordinary that the Court of Appeals found that the traffic warrant was used as a mere pretext to search Taglavore for marihuana cigarettes and ordered the evidence excluded. See also, Amador—Gonzalez v. United States, 391 F.2d 308 (5th Cir.1968).

In this case, however, the "D.C. Warrant" was issued on April 15, 1970 which was before the bank robbery even took place. Moreover, carrying a dangerous weapon constitutes a serious offense. It is not some petty or summary offense for which the police rarely arrest anyone. Consequently, any suggestions that it was issued as in *Taglavore* merely to enable the FBI agents to search for bait money must be dismissed as pure nonsense.

As to defendant's second point, the federal courts have unanimously agreed that evidence found in a search incident to a lawful arrest for one crime may be used in the prosecution of another. See United States v. Frankenberry, 387 F.2d 337 (2nd Cir.1967): Cotton v. United States, 371 F.2d 385 (9th Cir. 1967); Taglavore v. United States, supra. In terms of the protection of individual rights, it would be meaningless to exclude such evidence since, in any case, the lawful arrest on another charge entitles law enforcement officials to invade the privacy of the arrestee's person. Hence a different rule would have no practical effect, except as a windfall to those who choose to violate the law in a multiplicity of ways.

Next the defendant questions the scope of the strip-search and the delay in conducting it. In accordance with the overwhelming authority, we hold that thorough strip-searches which the FBI conducts as a matter of routine are not unreasonable; and for obvious reasons, any delay until the arrestee can be transported to FBI headquarters does not violate the Fourth Amendment either. See United States v. DeLeo, 422 F.2d 487 (1st Cir.1970) (Coffin, J.), cert. denied, 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648; United States v. Lipscomb, 435 F.2d 795 (5th Cir.1970) (Wisdom, J.); United States v. Miles, 413 F.2d 34 (3rd Cir.1969); United States v. Frankenberry, supra; Cotton v. United States, 371 F.2d 385 (9th Cir.1967). Accord Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L. Ed.2d 668 (1960).

As Judge Wisdom explained in the *Lipscomb* case, a thorough search is necessary for several reasons:

"It cannot be denied that to prevent escape, self-injury, or harm to others,

the police have a legitimate interest in separating the accused from the property found in his possession. An inventory is then necessary both to preserve the property of the accused while he is in jail and to forestall the possibility that the accused may later claim that some item has not been returned to him." 435 F.2d at 800.

Defendant's reliance upon Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967) is misplaced. In that case the Supreme Court sanctioned a "frisk-search" of the person without probable cause to arrest where the investigating officer has reason to believe the detainee may be carrying a weapon. But the considerations of human dignity are very different when a person has already been arrested and faces incarceration. Then, out of necessity, the permissible scope of the search must be expanded.

In the *DeLeo* opinion, Judge Coffin explained the necessity for delay in conducting such a thorough search.

" * * * The fact that a suspect, arrested in a public place, has been subjected only to a hasty search for obvious weapons has a reasonable nexus with the necessity of conducting a more deliberate search for weapons or evidence just as soon as he is in a place where such a search can be performed with thoroughness and without public embarrassment to him. While the legal arrest of a person should not destroy the privacy of his premises, it does—for at least a reasonable time and to a reasonable extent—take his own privacy out of the realm of protection from police interest in weapons, means of escape, and evidence. Were this not to be so, *every person arrested for a serious crime would be subjected to thorough and possibly humiliating search where and when apprehended.* We see no constitutional mandate for such a practice." (Emphasis added.)

 Finally, the defendant argues that even if the agents could legally

search the defendant, nevertheless, they lacked probable cause to *seize* the ten dollar bill in question. See Caver v. Kropp, 306 F.Supp. 1329 (E.D.Mich. 1969); State v. Elkins, 245 Or. 279, 422 P.2d 250 (1966). But in this case, the agents did not need independent probable cause to seize the money. Rather the agents could do so as a part of the administrative process necessary to prepare the defendant for safe incarceration. For these reasons, we reject defendant's contention that the bait money in question cannot be admitted into evidence at his trial for bank robbery. Rather we hold that it was lawfully seized incident to his arrest on the "D.C. Warrant."