STATE OF HAWAII, Plaintiff-Appellee, *v.* CANDACE DIONE
CLARK, Defendant-Appellant

NO. 8102

(CRIMINAL NO. 53817)

NOVEMBER 23, 1982

RICHARDSON, C.J., LUM, NAKAMURA, JJ.,
AND RETIRED JUSTICES OGATA AND MENOR,
ASSIGNED TEMPORARILY

OPINION OF THE COURT BY RICHARDSON, C.J.

This is an appeal from a judgment of conviction for first degree theft. More specifically, defendant-appellant Clark appeals an order denying her motion to suppress as evidence currency recovered from her vagina during a warrantless, nonconsensual, stationhouse search conducted approximately four hours after her arrest. The lower court held that the search contravened neither U.S. Const. amend. IV[1] nor Hawaii Const. art. I, § 7,[2] being incident to a valid arrest and being supported by probable cause and exigent circumstances. We reverse.

I.

On December 9, 1979, at approximately 12:30 in the morning, Clark was arrested by a policeman on routine street patrol for first

---

[1] The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
The amendment, of course, delimits state as well as federal action through incorporation in the Due Process Clause of U.S. Const. amend. XIV. Wolf v. Colorado, 338 U.S. 25, 27-28 (1949).

[2] The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

degree theft of U.S. currency from complainant. The complainant stated that about an hour prior to Clark's arrest he had arranged to meet her and another woman in his hotel room, where they were to engage in sexual relations with him for a fee. The meeting occurred, prior to which, he stated, he placed $950 in $100, $50 and $20 denominations in his coat pocket in the bathroom.

While he was in the bedroom with the other woman, Clark went to the bathroom. When he subsequently went to check his money, both women first tried to prevent him from so doing, and then ran out the door. Upon finding his money missing, he pursued them to the street, where he caught Clark about five minutes later. She was arrested soon thereafter.

About forty-five minutes after her arrest, she was taken to the police station. There, she testified, she was initially placed in a holding cell with six other women for some time.

A police matron was one of two females assigned to the booking desk at the time. As part of the booking process, she took Clark into an adjacent bathroom to conduct a strip search of Clark involving the removal of all clothes. The matron found $60 in Clark's outer garments, and $20 in her underclothes, all in $20 denominations. The matron characterized this as a "custodial search."[3]

The matron then attempted a visual vaginal cavity search of Clark, a procedure which involved the arrestee bending over and the matron spreading the arrestee's buttocks from the rear and looking up her vagina. Asked why this additional search was sought, the matron testified that it was standard practice to conduct such a search of any person, particularly a prostitute,[4] arrested for theft. Although she had not been told by anyone that Clark might be secreting currency in her body cavities, the matron testified that she was aware that Clark had been arrested for the theft of more cur-

---

[3] This strip search appears to have been a routine part of the booking process. For example, the matron testified that she had previously strip searched seven other women during her shift, a number apparently consisting of all others processed during that shift. Of these, she testified that some had been arrested for assault, and some for disorderly conduct.

[4] Clark apparently had one or more prior arrests for prostitution, and the implication of the matron's testimony is clearly that she believed Clark to be a prostitute.

rency than had thus far been found. Locating the additional currency, she testified, was her sole reason for undertaking the visual cavity search. She broke off her attempt when Clark refused to cooperate.

Where Clark was next confined is not clear. A police officer testified that Clark was placed back in a holding cell with other women, while Clark testified that she was placed alone in a cell with a toilet.

While Clark was so confined, the matron informed the investigating detective of Clark's refusal to allow the visual cavity search and of the matron's suspicion that Clark was concealing currency in her vagina. With this information and the information from complainant on the alleged theft, the detective concurred and determined that a vaginal search of Clark be performed by a city doctor. Such a search was performed at a nearby sterile room by the doctor with the matron and a police officer, also female, in attendance. The search, utilizing standard medical procedures, involved placing Clark on a table and her legs in stirrups, and inserting a speculum into her vagina. At approximately 4:30 a.m., the doctor recovered $650 in $100 and $50 denominations therefrom.

No warrant was ever sought for any of the searches of Clark. With regard to the final one resulting in recovery of the currency, the investigating detective testified that he thought it would take too long to get a warrant and that they could neither confine Clark in sufficient facilities nor sufficiently guard her in the interim to prevent her from destroying the evidence. He also testified, however, that he was aware both of the fact that there was at the time a magistrate on call, and that it would have been possible, although administratively inconvenient, to confine Clark so as to prevent destruction of the evidence. He testified that there was a room at the station without a toilet where she could have been watched.

Clark was subsequently indicted for first degree theft. Prior to trial, she moved to suppress as evidence the $650 obtained from the body cavity search. In denying the motion, the lower court concluded that the search was incident to a valid arrest, there was a clear indication that the evidence would be found, and there were exigent circumstances for conducting the warrantless search. The exigent circumstances were that there was a commode located within the cell where defendant was detained and defendant could have destroyed

the evidence in the commode, had not an immediate body cavity search been conducted.

Following a subsequent jury trial at which, we presume, the $650 recovered from her vaginal cavity was introduced as evidence,[5] Clark was convicted of first degree theft and now appeals from that judgment of conviction.

## II.

We resolve this appeal solely on the question whether the final body cavity search of defendant-appellant Clark constituted an "unreasonable search" under U.S. Const. amend. IV or Hawaii Const. art. I, § 7.[6] [7]

---

[5] We must only presume so since the record on appeal regards solely the motion to suppress.

[6] We note that other courts have considered other constitutional proscriptions, most notably the Due Process Clause of U.S. Const. amend. XIV, in analyzing the validity of similar searches of the person. *See, e.g.,* Rochin v. California, 342 U.S. 165 (1952) (induced regurgitation obtained by police force was "conduct that shocks the conscience[,]" *id.* at 172, so as to offend the Due Process Clause, *id.* at 174); Breithaupt v. Abram, 352 U.S. 432 (1957) (withdrawal of blood sample from unconscious hospital patient following automobile accident not violative of Due Process Clause); Huguez v. United States, 406 F.2d 366, 379-82 (9th Cir. 1968) (rectal cavity search procedure violative of due process); and United States ex rel. Guy v. McCauley, 385 F. Supp. 193 (E.D. Wis. 1974) (strip search of seven-month-pregnant woman by non-medical personnel in nonmedical setting violative of U.S. Const. amend. V due process clause. *Id.* at 197-201.) *See also* People v. Seymour, 80 Ill. App.3d 221, 398 N.E.2d 1191 (1979) (strip search violative of state constitutional right of privacy).

[7] Though we do not deem it necessary to consider directly the validity of the strip search and accompanying visual cavity search of Clark, we cannot but here express our strongest reservations with regard to the constitutional propriety of any such search undertaken under police regulations which subjects all arrestees, detainees, etc. to such intensive searches regardless of the particulars of each arrest. *See, e.g.,* Tinetti v. Wittke, 479 F. Supp. 486 (E.D. Wis. 1979) (blanket strip search policy as applied to traffic violator detained for inability to post cash bond without relation to likelihood of detainee's concealment of weapons or contraband violative of U.S. Const. amends. IV, V & XIV; permanent injunction issued), *aff'd,* 620 F.2d 160 (7th Cir. 1980); Logan v. Shealy, 660 F.2d 1007 (4th Cir. 1981) (42 U.S.C. § 1983 action against county officials after strip search following arrest for drunk driving under policy to so search all detainees for weapons or contraband regardless of offense; policy held "unconstitutional under the standards laid out in Bell v. Wolfish, 441 U.S. 520 [(1979)]"). *See generally* Shuldiner, *Visual Rape: A Look at the Dubious Legality of Strip Searches,* 13 J. Mar. 273 (1980).

 

## III.

The "Fourth Amendment . . . protects people from unreasonable government intrusions into their *legitimate expectations of privacy*[,]" *United States v. Chadwick*, 433 U.S. 1, 7 (1977) (emphasis added), and such description well illustrates that there is no expectation of privacy of greater legitimacy than that which we have in our "private parts."[8]

The Fourth Amendment being clearly applicable to body cavity searches, we next reiterate that such a search conducted without a warrant, as was the instant one, is presumptively unreasonable. *Katz v. United States*, 389 U.S. 347, 357 (1967); *State v. Rosborough*, 62 Haw. 238, 241, 615 P.2d 84, 86 (1980). It is the government which bears the burden of proving a warrantless search to be reasonable, *Chimel v. California*, 395 U.S. 752, 762 (1969), a task it may accomplish by showing that "the facts of the case justified the police in searching without a warrant and that the search itself was no broader than necessary to satisfy the need which legitimized departure from the warrant requirement in the first place." *State v. Kaluna*, 55 Haw. 361, 363, 520 P.2d 51, 55 (1974) (citing *Cupp v. Murphy*, 412 U.S. 291, 295 (1973)). And we think it well worth repeating why this is so:

> The judicial warrant has a significant role to play in that it provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer "engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14 (1948).

*United States v. Chadwick, supra,* at 9. *Accord: State v. Dorson*, 62 Haw. 377, 384, 615 P.2d 740, 745 (1980).

The various justifications advanced by the governments to sup-

---

[8] One court aptly summarized the various described effects of government intrusion into this paramount expectation of privacy as follows:

> A search of [this] . . . type . . . including the visual inspection of the anal and genital areas, has been characterized by various witnesses here, and by judges in some other cases, as demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, [and] signifying degradation and submission. . . .

Tinetti v. Wittke, 479 F. Supp. 486, 491 (E.D. Wis. 1979) (citing an oral decision in Sala v. County of Suffolk (E.D.N.Y. 1978)).

port warrantless searches have coalesced into "a few specifically established and well-delineated exceptions [to the warrant requirement.]" *Katz v. United States, supra,* at 357 (footnote omitted). In general, these exceptions "provide for those cases where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate." *Arkansas v. Sanders,* 442 U.S. 753, 759 (1979). We now turn to three of these exceptions urged to our attention by the state as justifications for its warrantless search of defendant.

## A.

The first and perhaps the most general of all exceptions occurs when the government has probable cause to search, and exigent circumstances exist which advise against delay in proceeding to do so. *United States v. Chadwick, supra,* at 11; *State v. Elderts,* 62 Haw. 495, 500, 617 P.2d 89, 92 (1980). We focus here only on the exigent circumstances requirement, since our belief that such circumstances were lacking effectively dispenses with the need to consider whether there existed probable cause to search.

While "the term 'exigent circumstances' is incapable of precise definition," *State v. Elliott,* 61 Haw. 492, 495-96, 605 P.2d 930, 933 (1980), "[g]enerally speaking . . . [it] may be said to exist when the demands of the occasion reasonably call for an immediate police response." *State v. Lloyd,* 61 Haw. 505, 512, 606 P.2d 913, 918 (1980). More specifically, it includes situations presenting an immediate danger to life or of serious injury or an immediate threatened removal or destruction of evidence. *State v. Dorson,* 62 Haw. at 385, 615 P.2d at 746. However, "[t]he burden, of course, is upon the government to prove the justification . . . , and whether the requisite conditions exist is to be measured from the totality of the circumstances." *State v. Lloyd,* 61 Haw. at 512, 606 P.2d at 918. And in seeking to meet this burden, "[t]he police must be able to point to specific and articulable facts from which it may be determined that the action they took was necessitated by the exigencies of the situation." *State v. Dias,* 62 Haw. 52, 57, 609 P.2d 637, 640 (1980).

Applying these principles to the facts here, we disagree with the trial court that exigent circumstances required the immediate war-

rantless search of Clark. Foremost among the reasons why we so conclude are the following: (1) It was unlikely that Clark was concealing a weapon in her vaginal cavity, or, at the least, there is no indication that she was suspected of so doing; (2) there was no doubt that Clark was suspected solely of concealing currency, evidence which stood no risk of dissipating with time such as by absorption or dissolution. *Compare Schmerber v. California,* 384 U.S. 757 (1966) (evanescence alcohol in blood as contributing to exigent circumstances) *with State v. Fontenot,* 383 So.2d 365, 367 (La. 1980) (no exigent circumstances in part because evidence sought contained in pill bottle in arrestee's vaginal cavity; no danger of absorption or dissolution during delay in obtaining warrant); (3) pending issuance of a search warrant, Clark could have been detained in a place or manner which would have precluded the destruction of whatever evidence she was suspected of concealing; and (4) procedures were available and known to the police under which a magistrate's decision on a warrant could have been obtained with very minimal delay. *See* Hawaii R. Penal P. 41(g) (warrant by telephone on oral statements). *Cf. State v. Kapoi,* 64 Haw. 130, 147, 637 P.2d 1105, 1117 (1981) (Lum, J., dissenting) ("The fact that defendant's arrest occurred in the early morning hours, making it inconvenient to secure a warrant, carries little weight in this jurisdiction as a reason to by-pass the fourth amendment. *See State v. Texeira,* 62 Haw. 44, 51, 609 P.2d 131, 136 (1980).")

## B.

Finding the exigent circumstances exception to the warrant requirement inapplicable, we turn to the second exception urged on us, that of a search incident to lawful arrest.

The nature and extent of this exception was described by the court as follows:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its

concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary item must, of course, be governed by a like rule.

*Chimel v. California, supra,* 395 U.S. at 762-63.[9] In essence, the exception implies the exigent circumstances of imminent danger to the arresting officer or others and of imminent concealment or destruction of evidence or the fruits of the crime from the circumstances of a lawful arrest, and therefore permits a warrantless search to proceed incident thereto.

The court in *Schmerber v. California,* 384 U.S. 757 (1966), however, limited the power of the police to conduct a warrantless search, incident to arrest, beyond the body's outer surface. The court stated:

> The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions [beyond the body's surface] on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search.

*Id.* at 769-70. The court then concluded that the arresting officer should not ordinarily be permitted to apply this standard himself instead of procuring a warrant.

> Search warrants are ordinarily required for searches of dwellings, and, absent any emergency, no less could be required where intrusions into the human body are concerned . . . . The importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great.

*Id.*

Thus the rule set forth in *Schmerber* is that a warrantless search beyond the outer surface of the body is permissible only if there is a clear indication[10] that evidence will be found, and there is an emer-

---

[9] The court subsequently clarified that "searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention." United States v. Edwards, 415 U.S. 800, 803 (1974).

[10] "Clear indication" is a more difficult standard to meet than "real suspicion," United States v. Mastberg, 503 F.2d 465, 471 (9th Cir. 1974), but not as difficult as "probable cause." United States v. Aman, 624 F.2d 911, 913 n.1 (9th Cir. 1980).

gency which makes the delay in getting a warrant threaten the destruction of evidence.

This rule follows logically from our decision in *State v. Kaluna,* 55 Haw. 361, 520 P.2d 51 (1974) where we limited the power of the police to search incident to arrest. We stated as a basic principle that a warrantless search "is lawful only if no broader than necessary in light of the justification." *Id.* at 372, 510 P.2d at 60.

This type of search may be justified as protection of evidence or the safety of police officers, but the principle in *Kaluna* mandates that the search conform to the rule in *Schmerber.* We must narrowly define what is necessary in these extremely intrusive searches. It is humiliating and degrading to be forced to totally expose one's self to a total and hostile stranger. There is also the danger that the police will use such searches to embarrass or harass arrested people.

These concerns lead us to hold that the *Schmerber* rule is required by art. I, § 7 of the Hawaii Constitution. Our constitution was written to protect the interests we find protected in *Schmerber.*

In applying this rule to the present case, the pivotal issue is whether defendant's ability to get to the hidden evidence presented an emergency. We need not decide whether there was a clear indication that evidence would be found because we conclude that there was no emergency.

This case presents a situation different from that in *Schmerber.* There the defendant was arrested for driving while intoxicated. At the direction of the police a physician at a hospital withdrew a blood sample to test for alcohol despite the defendant's refusal. The Court held that the facts showed an emergency because there was no time to obtain a warrant since natural body functions begin to diminish the percentage of alcohol in the blood shortly after drinking stops.

One element of danger that evidence might be destroyed is present here that was not in *Schmerber.* The defendant in that case could not have destroyed the evidence if he wished to; only time and normal bodily functions could have. We observed above, however, that the police could have detained and watched defendant here so as to prevent destruction of evidence during the short delay caused by getting a warrant. This burden on the police does not raise this situation to the level of an emergency. *State v. Fontenot,* 383 So.2d 365 (La. 1980). We hold, therefore, that this search was not legal as a search incident to arrest.

## C.

The final exception to the warrant requirement that could apply here is a search made prior to incarceration. A pre-incarceration search may proceed without a warrant to prevent the entry into a cell of weapons or contraband, and to inventory the arrested person's belongings. *United States v. Klein,* 522 F.2d 296 (1st Cir. 1975); *United States v. Tillery,* 332 F. Supp. 217 (E.D. Pa. 1971). Yet this search is limited. In *Kaluna, supra,* we stated:

> While the police have valid reasons to conduct a limited pre-incarceration search, it is clear from the reasoning of the first part of this opinion that such a search should be no broader than necessary in light of those reasons.

55 Haw. at 373, 510 P.2d at 61.

Just as the reasoning in *Kaluna* is relevant to pre-incarceration searches, so too is the standard in *Schmerber v. California, supra.* The standard of warrantless searches into the body is the same for searches incident to arrest as for pre-incarceration searches: there must be a clear indication that evidence will be found and an emergency prevents the obtaining of a warrant. To hold otherwise would allow the police to conduct such a search without the restrictions of *Schmerber* merely by placing the arrested person in a cell.[11]

The judgment of conviction and the order denying defendant's motion to suppress are reversed and the case is remanded for further proceedings.

*Brook Hart* and *Michael D. Wilson (Peter C. Wolff, Jr.,* with them on the briefs; *Hart* and *Wolff* of counsel) for defendant-appellant.

*Thomas M. Pico, Jr. (Arthur E. Ross* on the brief), Deputy Prosecuting Attorneys, for plaintiff-appellee.

---

[11] The situation here is different from that of a prisoner entering the main prison. The prison presents special security problems. *Cf.* State v. Martinez, 59 Haw. 366, 580 P.2d 1282 (1978) (officials may condition visit to prison on consent to strip search). Also, those convicted of a crime lose many rights and privileges of the ordinary citizen. Wolff v. McDonnell, 418 U.S. 539, 555 (1976); Price v. Johnston, 334 U.S. 266, 284 (1948). Our holding, therefore, concerns only a search conducted before arriving at, or while at, the police station, and not with the issue of what prison officials may do to prevent contraband from entering the prison.