827 A.2d 157

**Dwight EVANS**

v.

**STATE of Maryland.**

**No. 289, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

June 25, 2003.

Cathy A. Hinger (Piper Rudnick L.L.P., on brief), Washington, DC, for appellant.

Celia Anderson Davis, Asst. Atty. Gen. (J. Joseph Curran, Jr., on brief), Baltimore, for appellee.

Argued before DAVIS, HOLLANDER and SONNER, JJ.

SONNER, J.

Appellant, Dwight Evans, appeals the denial of post-conviction relief by the Circuit Court for Baltimore City. In 1995, a jury convicted Evans of distribution of cocaine and possession with intent to distribute cocaine. Thereafter, the court sentenced Evans to consecutive sentences of fourteen years for distribution of cocaine and five years for possession with intent to distribute. Evans appealed his convictions to this Court, where a divided panel reversed the convictions. The State appealed our decision to the Court of Appeals, which reversed us and reinstated the convictions and sentence. Later, the circuit court denied post-conviction relief to Evans, concluding that Evans's Fourth Amendment challenge had already been litigated, that case law foreclosed review of his due process claim, and that Evans had failed to show ineffective assistance of counsel.

Evans presents three issues for our review, which we quote:

I. Whether Evans was denied effective assistance of counsel under the Sixth Amendment because his trial counsel failed to move to suppress evidence recovered during the warrantless rectal search of Evans on the grounds that absent emergency circumstances, warrantless body cavity searches violate the Fourth Amendment and there were no emergency circumstances in this case.

II. Whether Evans was denied effective assistance of counsel under the Sixth Amendment because his trial counsel failed to move to suppress evidence recovered during the warrantless rectal search of Evans on the grounds that this warrantless rectal search violated Evans's Fourth Amendment rights because it was conducted on a public street, in daylight, and without medical assistance.

III. Whether Evans was denied effective assistance of counsel under the Sixth Amendment because: (1) his

trial counsel failed to recognize that he might not succeed in his argument that Evans was not under arrest; (2) trial counsel failed to move to suppress an incriminating statement made by Evans on the ground that the State could not meet its burden of proving the statement was voluntary because Evans was not provided with *Miranda* warnings; and (3) since the Court of Appeals did find that Evans was under arrest, it is clear Evans was denied due process protections ordinarily incident to arrest, that if raised, should have prevented Evans' incriminating statement from reaching the jury.

We conclude that Evans's counsel failed to satisfy objective standards of trial conduct, so we reverse the circuit court's denial of post-conviction relief.

### Factual Background

The Court of Appeals stated the facts giving rise to this case in its 1999 opinion:

In June of 1994, Officer Kenneth Rowell was involved with other members of the Baltimore City Police Department Violent Crimes Task Force in an undercover operation known as "Operation Mid–East." The goal of Operation Mid–East was to identify and combat street-level drug transactions. In accordance with that goal, once the police had probable cause to believe a suspect was engaged in an illegal drug transaction, that suspect was not taken to the police station and processed. Instead, the police detained the suspect, ascertained the suspect's identity and address, performed an outstanding warrant check, conducted a search of the suspect's person, seized any drugs or currency, and, finally, released the suspect. The Baltimore City Police employed this procedure to protect the integrity of the ongoing undercover operation, later conducting a "mass sweep" of arrests of the suspects once the operation had concluded.

At 7:45 p.m. on June 9, 1994, Officer Rowell was involved in Operation Mid–East in the vicinity of Monument and

Port Streets in Baltimore City. Officer Rowell had been outfitted with a "Kel Set," or body wire. Although the record is not clear as to who approached whom, at that time a conversation took place between Officer Rowell and Respondent Dwight Evans. Rowell testified that he asked Evans if he was working and, if so, what Evans had. According to Officer Rowell, Evans responded that he had "dimes of coke." Rowell requested a dime.

Officer Rowell then accompanied Evans as the pair walked east of Monument Street. At that point, Rowell testified that Evans "reached into his rear end, down inside his pants, removed the cocaine, [and] handed me one." In exchange, Officer Rowell handed Evans a ten dollar bill. The serial number of the currency had previously been photocopied by the police for the purpose of subsequent identification. After this transaction, the pair separated.

Officer Rowell continued along Monument Street toward Milton Avenue. After Officer Rowell assured himself that no one was in the vicinity, he transmitted a description of Evans to a nearby "identification team" composed of task force members. Approximately five to ten minutes later, the team stopped Evans. Officer Rowell, who had entered his automobile and repeated his description of the suspect, drove by the area where Evans had been detained. Rowell confirmed that the person detained by the identification team was in fact the same individual from whom he had purchased the cocaine.

After the confirmation of Evans's identity as the suspected drug dealer, a member or members of the technical team searched Evans. Because the identification team had difficulty locating any suspected controlled substances, someone again contacted Officer Rowell. Rowell indicated that Evans had taken the cocaine from his "rear area." Based on this information, the identification team searched Evans again. The two searches eventually produced $163.00 in United States currency, including the ten dollar bill that Officer Rowell had earlier handed Evans, as well as nine green-topped vials containing cocaine.

Evans was given a receipt for the seized money and photographed by the technical team. Police procedure pursuant to Operation Mid–East required that a suspect verify his or her identity before being released. Accordingly, the police called Evans's father, who came to the area and confirmed his son's identity. At that time, the police did not transport Evans to the police station, nor did they formally charge him, nor did they take Evans before a District Court Commissioner. Rather, the officers apparently followed an internal procedure whereby one of them completed a document entitled "Investigated and Released." Evans was then released.

*State v. Evans*, 352 Md. 496, 500–03, 723 A.2d 423 (1999) (footnotes omitted).

Evans appealed his convictions to this Court, asserting that because the police failed to arrest him, they could not search him incident to an arrest. *Evans v. State*, 113 Md.App. 347, 688 A.2d 28 (1997). A divided panel of this Court decided that the police action did not constitute an arrest of Evans and the proceeds of the search conducted incident to that "non-arrest" should have been suppressed. That led to a reversal of the judgments of the circuit court.

The State successfully appealed to the Court of Appeals. *State v. Evans*, 352 Md. 496, 723 A.2d 423 (1999). The Court of Appeals concluded that the detention of Evans did constitute an arrest, even though the police filed no formal charges until a later date. The Court also concluded that, because the police arrested Evans, they could also search incident to arrest and any seized evidence was admissible. In effect, the Court of Appeals reversed our decision and reinstated the convictions.

Pursuant to Maryland Code (1957, 1996 Repl.Vol.), Article 27, section 645A, then in effect,[1] Evans filed a petition for

---

1. The General Assembly has since recodified the provisions of the Uniform Post-conviction Procedure Act at Maryland Code (2001), Criminal Procedure Article, section 7–101, *et seq.*

post-conviction relief in January, 2000. His amended petition, filed in late October, 2000, presented three claims of error. First, Evans asserted that the police did not arrest him and, consequently, the search incident to arrest exemption did not apply. Second, even if the police arrested Evans, the circumstances surrounding that arrest violated due process. Finally, Evans argued that because his counsel did not reopen the suppression hearing and challenge his rectal search as unreasonable under the Fourth Amendment, counsel did not provide Evans with effective assistance.

The circuit court disagreed, concluding that the Court of Appeals's decision in this case finally litigated the arrest issue. In response to Evans's second contention, the court concluded that it would not grant post-conviction relief for a claim of illegal arrest, citing *Johnson v. Director of Patuxent Institution*, 243 Md. 708, 710, 222 A.2d 248 (1966) (concluding that Johnson could not prevail on his illegal arrest theory because he had failed to show prejudice). Finally, the court decided that Evans had failed to show that his trial counsel lacked a tactical reason for not objecting to the search based on its alleged unreasonable nature, and so it rejected his claims of ineffective assistance of counsel. This appeal followed.

## Discussion

### I. *Strickland v. Washington*

Article 21 of the Maryland Declaration of Rights and the Sixth Amendment of the U.S. Constitution guarantee all criminal defendants effective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court announced the standard to be applied when determining whether counsel's representation of a defendant satisfied the protections of the Sixth Amendment. *See also Perry v. State*, 357 Md. 37, 38, 741 A.2d 1162 (1999); *Wiggins v. State*, 352 Md. 580, 602, 724 A.2d 1 (1999), *aff'd in part, rev'd in part*, 164 F.Supp.2d 538 (D.Md.2001). To satisfy *Strickland*, a defendant must show, first, that counsel's conduct was deficient and, most important, that the deficiency prejudiced the defense. 466 U.S. at 687, 104 S.Ct. 2052;

*Perry,* 357 Md. at 78, 741 A.2d 1162. To prove deficient performance, the defendant must: (1) demonstrate that "counsel's acts or omissions, given the circumstances, 'fell below an objective standard of reasonableness considering prevailing professional norms,'" and (2) "overcome the presumption that the challenged conduct 'be considered sound trial strategy.'" *Wiggins,* 352 Md. at 602, 724 A.2d 1. To satisfy the prejudice prong, there must be a showing that counsel's errors were "so serious as to deprive [the defendant] of a fair trial, a trial whose result is reliable." *Oken v. State,* 343 Md. 256, 284, 681 A.2d 30 (1996) (quoting *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993)).

 Although this standard invites complete review of counsel's performance, *Strickland* holds that our review must be restrained. The standard that counsel is held to is "reasonably effective assistance." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. We must be highly deferential in reviewing counsel's performance, and because we want to avoid "second-guess[ing] counsel's assistance," we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052. To overcome this strong presumption, a defendant must show that counsel's conduct was not "sound trial strategy." *Id.* Once the defendant cites specific acts or omissions of counsel, the court examines them in "light of all the circumstances" of the case, and determines whether those acts or omissions were "outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. 2052.

 The defendant also bears the burden of proving the prejudice prong. *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* A defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. "Reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id. See*

*Perry,* 357 Md. at 80, 741 A.2d 1162 (quoting *Oken,* 343 Md. at 284, 681 A.2d 30).

■ Beyond the directions of *Strickland,* we are still governed by the general rules of appellate review. Specifically, determinations by the circuit court regarding effective assistance of counsel claims are mixed questions of law and fact. *State v. Gross,* 134 Md.App. 528, 559–60, 760 A.2d 725 (2000), *aff'd,* 371 Md. 334, 809 A.2d 627 (2002). "We 'will not disturb the factual findings of the post-conviction court unless they are clearly erroneous.'" *State v. Jones,* 138 Md.App. 178, 209, 771 A.2d 407 (quoting *Wilson v. State,* 363 Md. 333, 348, 768 A.2d 675 (2001)), *cert. granted,* 365 Md. 266, 778 A.2d 382 (2001). We will make our own independent analysis, however, based on our own judgment and application of the law to the facts, of whether the State violated a Sixth Amendment right. *Jones,* 138 Md.App. at 209, 771 A.2d 407 (citing *Harris v. State,* 303 Md. 685, 699, 496 A.2d 1074 (1985)). Consequently, absent clear error, we defer to the post-conviction court's historical findings, but we conduct our own review of the application of the law to the defendant's claim of ineffective assistance of counsel. *See Cirincione v. State,* 119 Md.App. 471, 485, 705 A.2d 96 (1998).

### II. The Performance Prong

■ Evans argues the performance prong on two fronts. First, he argues that the search of his "rear area" in an exposed area of a public street obviously violated the reasonableness clause of the Fourth Amendment and that any competent attorney would have argued for suppression of the seized evidence on this ground. Second, because the police arrested Evans, they should have read him his *Miranda* warnings before he signed the seized money receipt. Again, Evans asserts that a competent attorney would have objected to the introduction of the receipt. Evans asserts that the police subjected him to a rectal exam on the streets of Baltimore City with two female officers standing guard. Consequently, absent reasoned professional judgment or trial strategy, counsel would have been deficient in failing to object

to the alleged rectal examination. *See, generally, Perry,* 357 Md. at 78–79, 741 A.2d 1162.

The State counters both assertions. First, the State takes issue with Evans's characterization that the search of his "rear area" was a body cavity or rectal search. The State contends that the testimony supports only a conclusion that the drugs were either in Evans's shorts or between his "butt checks." In either case, the search was reasonable, and the testimony did not present a basis, either at the suppression hearing or at trial, to object to the search. Next, the Attorney General argues that the *Miranda* argument fails for two reasons. First, Evans did not include this argument in his petition; consequently, we should not consider it. Second, police neither placed Evans in custody, nor interrogated him and, consequently, the law required no *Miranda* warnings. Because we find that Evans's counsel failed to provide him with effective assistance on the search issue, we need not explore the testimonial nature of the receipt and the application of *Miranda* to his signing it. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

As we noted, the State contends that the search involved nothing more than the police removing vials from Evans's buttocks area, and, at a minimum, from inside his shorts. If we were to believe the State's interpretation of the facts, our review would be governed by *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (holding that the test of reasonableness under the Fourth Amendment requires the balancing of the need for the particular search against the invasion of personal rights, and factors to consider in that analysis are the scope of the particular intrusion, the manner in which it was conducted, the justification for initiating it, and the place in which it is conducted).

Officer Timothy Chester testified that he recovered vials from Evans's rear and that the area where Evans was searched was "famous for rectal—they hide it a lot in their rectal areas." In addition, he testified that he asked the female officers at the scene to turn their backs because he

"was going in his rear." Officer Valencia Vaughn testified that Officer Chester "recovered the drugs from Evans's rear." Evans alleges that the State's opening statement at trial confirms a body cavity search occurred because the State noted that "those nine additional vials that the defendant had on his person, in his rear end in this case, were his inventory for sale." Evans's cousin, Joanna Rawlings, testified that "[t]he big police officer [ (presumably Chester) ] searched [Evans], then they searched his rectal area."

The fact that most calls the State's account into question is Officer Chester's testimony that the vials were "individually packed, and I retrieved some rubber gloves, and I removed each vial, one by one." If the vials were in Evans's shorts, there would be no need to retrieve them "one by one" from his "rear area" or place the vials in "rubber glove[s] for sanitary purposes." The reference to removing the vials one by one supports Evans's contention that a rectal search occurred.

If Officer Chester subjected Evans to a rectal search on the streets of Baltimore City, the fruits of that search would have been suppressed. There are three cases that we believe bear this point out. *See Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952); *United States v. McCauley,* 385 F.Supp. 193, 198–99 (E.D.Wis.1974); *State v. Clark,* 654 P.2d 355, 362, 65 Haw. 488 (1982).

Although decided under the rubric of the Fourteenth Amendment, *Rochin* frames the issue for these types of searches. Deputy sheriffs stormed into Rochin's bedroom, where he and his wife were sitting on the bed. Officers noticed two capsules on the night stand next to Rochin and, when they asked who the capsules belonged to, Rochin grabbed and attempted to swallow the capsules. Although the police tackled Rochin and attempted to prevent him from swallowing, their efforts were to no avail. The officers then handcuffed Rochin and took him to a hospital, where a doctor was ordered to force an emetic solution down Rochin's throat. The emetic caused Rochin to vomit the capsules, which tested positive for morphine.

The Supreme Court reversed Rochin's conviction. 342 U.S. at 174, 72 S.Ct. 205. After reviewing the contours of the Fourteenth Amendment and its place in the federal/state relationship, the Court stated:

Applying these general considerations to the circumstances of the present case, we are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combating crime too energetically. This is conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation [sic].

*Id.* at 172, 72 S.Ct. 205. The Court went on to say:

We therefore put to one side cases which have risen in the State courts through use of modern methods and devices for discovering wrongdoers and bringing them to book. It does not fairly represent these decisions to suggest that they legalize force so brutal and so offensive to human dignity in securing evidence from a suspect as is revealed by this record. Indeed the California Supreme Court has not sanctioned this mode of securing a conviction.

\* \* \*

We are not unmindful that hypothetical situations can be conjured up, shading imperceptibly from the circumstances of this case and by gradations producing practical differences despite seemingly logical extensions. But the Constitution is "intended to preserve practical and substantial rights, not to maintain theories."

*Id.* at 174, 72 S.Ct. 205 (citation omitted).

The U.S. District Court for the Eastern District of Wisconsin examined this issue under the Fourth Amendment in *McCauley.* Milwaukee police arrested Betty Jean Guy on an

arrest warrant, charging her with the sale of cocaine. Two female officers escorted Guy, who was seven months pregnant at the time, into her bathroom. The officers ordered Guy to strip, bend over, and spread her buttocks. The officers examined her "privates" and found nothing.

Once Guy was taken to the police station, officers decided to search her again because of her reputation for hiding contraband in her vagina. The female officers took Guy into the vice squad room and, again, ordered her to disrobe. Guy bent over, this time assisted by a chair, while one of the officers, wearing rubber gloves, spread her buttocks and the other shined a flashlight into her private area. The officers noticed the corner of a plastic container protruding from her vagina. They ordered her to remove the bag, which later was found to contain small plastic containers of heroin amounting to .29 grams.

In her petition for habeas corpus relief, Guy challenged the search on the grounds that, "even if the officers had the right to search her, they abused their right in that the manner in which the search was executed was unreasonable." *McCauley*, 385 F.Supp. at 197. Citing *Rochin*, the court framed the issue as "whether the strip searches of petitioner by nonmedical police personnel 'violate the general requirement that States in their prosecutions respect certain decencies of civilized conduct.'" *Id.* In granting the writ, the court stated:

> The police actions in this case abused common conceptions of decency and civilized conduct. It is true that the searches were carried out in what appear to have been sanitary conditions; that petitioner was never forced to lie down; that she was searched by other females; and that nothing was probed into any of her privates. These facts, however, do not overcome several other important facts. Petitioner, at the time of the searches, was seven months pregnant; she was painfully forced to bend over twice; and the two policewomen who perpetrated the search were not medically trained, nor did they utilize medical facilities or

equipment to aid them in their search, nor was it done in a hospital or medical environment.

* * *

While the probing and regarding of body cavities and sexual organs is a routine medical practice, it is not normal for it to be forced on individuals by nonmedical police personnel in nonmedical surroundings....

The intrusion into or the examination of either the vaginal or anal cavities must be made by skilled medical technicians for at least two reasons. The first is that the examination be carried our under sanitary conditions so that the dangers of physical harm to the individual be reduced. Second, the magnitude of the intrusion to the individual's integrity and dignity becomes greater if the search is perpetrated by a police officer rather than a doctor or nurse....

Physical examinations of sexual organs and/or body cavities by nonmedical personnel, however, are not routine to our everyday lives. In addition to being medically unsound, the forceful probing and examining of the vagina and anus by strangers attacks the very dignity, privacy, and integrity upon which our Constitution is founded.

*Id.* at 198–99, 72 S.Ct. 205.

Finally, the Supreme Court of Hawaii took occasion to examine this issue in *Clark*. Clark and another woman had arranged to engage a man in sexual relations in his hotel room. While the man was in the room with the other woman, Clark took money from his jacket. The man discovered the money missing, pursued Clark, caught up to her on the street, and called the police, who arrested her. At her booking, Clark was ordered to strip, and when the matron attempted to conduct a visual vaginal cavity search, Clark refused. Superior officers decided to get a doctor to conduct the search, without a warrant, and the doctor found $650.00 in $100 and $50 denominations in Clark's vagina.

The court examined whether the final search of Clark was unreasonable under the Fourth Amendment. In its review of the circumstances of Clark's case, the court held the search

presumptively unreasonable and found that the only justifications could be exigent circumstances, search incident to a lawful arrest, or a pre-incarceration search. The court held that none of the exceptions applied, focusing primarily on the search incident to arrest exception. Citing *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (holding that the removal of a blood sample from a suspect who appeared intoxicated was permitted because the evidence might have dissipated during the pendency of a warrant application), the court was of the opinion that the U.S. Supreme Court had limited the power of the police to conduct warrantless searches incident to arrest inside the body's surface. *Clark*, 654 P.2d at 361. The court found that *Schmerber* stands for the proposition that police may conduct a search incident to arrest inside the body's surface only if "there is a clear indication that evidence will be found, and there is an emergency which makes delay in getting a warrant threaten the destruction of evidence." *Id.* at 361–62. Because the police could have detained Clark in such a way to assure that any evidence could not have been secreted or destroyed by her until a warrant could be obtained, the court held the search improper.[2] *Id.* at 362.

These cases illustrate that, had the trial court been presented with the rectal search argument and not suppressed the evidence, there is a high probability that we would have reversed. We conclude that an attorney presented with the contested facts of this case who did not seek suppression of the evidence was objectively deficient. The issue is not whether a rectal exam did or did not occur; the issue is whether counsel should have argued that point to the court, given the testimony and inferences present at the time.

 Evans's counsel had significant evidence that, if believed by the suppression court, would lead to the suppression

---

**2.** There was a dispute as to whether the cell in which Clark was held had a toilet. The court stated that the police could have watched Clark and a warrant could have been obtained quickly because a magistrate was on call at the time.

of the vials of cocaine seized from Evans. This is not an amorphous area of the law, and a defense attorney presented with facts showing a public rectal exam on the streets of Baltimore City by police officers should know that the evidence produced from that exam would likely be suppressed. The failure of counsel "to move to suppress evidence, when the evidence would have been suppressed if objected to, can constitute deficient performance (cause), unless counsel's failure was due to a tactical decision." *Martin v. Maxey,* 98 F.3d 844, 848 (5th Cir.1996). *See also Kirkpatrick v. Butler,* 870 F.2d 276, 283 (5th Cir.1989) (concluding that a reasonable attorney would have argued for suppression of evidence seized from a capital murder suspect's home).

■ Here, there was no conceivable tactical advantage in not raising the unreasonableness of the invasive search. We note further that simply because one strong argument for suppression exists does not allow an attorney to ignore another, equally strong suppression argument. This is especially the case where the second defense "would bolster rather than detract from [the primary defense.]" *Foster v. Lockhart,* 9 F.3d 722, 726 (8th Cir.1993) (citing *Lawrence v. Armontrout,* 900 F.2d 127, 130 (8th Cir.1990)). Arguing that Evans was not arrested would not have been inconsistent with arguing that, even if he was legally arrested, the ensuing search was too invasive.

The Eighth Circuit applied these principles in *Henderson v. Sargent,* 926 F.2d 706 (1991). Henderson was convicted of the capital murder of Willa Dean O'Neal. The only piece of evidence conclusively linking Henderson to the scene of the crime was a piece of paper with a description of a lake front house and the phone number of the real estate agent with whom Henderson had an appointment, which was found on the floor of the furniture store that O'Neal owned and operated with her husband. Henderson produced evidence at the habeas corpus hearing that indicated that O'Neal's husband was the more likely suspect.

Henderson's counsel centered the defense on an alibi that was somewhat weakened when Henderson was forced to admit that he had visited the store, even though he told police he had never been there. In upholding the District Court's grant of the writ, the Eighth Circuit concluded that the alibi defense and shift of blame defense were entirely consistent. The court also concluded that no sound tactical reason existed not to pursue the shift of blame defense. As the court stated:

> Given this strong evidence showing counsel's complete failure to pursue a viable defense, we find trial counsel ineffective for failing to investigate the plausible defense theory that Bob O'Neal committed the murder.

*Henderson,* 926 F.2d at 712.

The considerations present in *Henderson* are equally at play in this case. As the Court of Appeals has said, the failure of an advocate to preserve an issue for appeal that "would have had a substantial possibility of resulting in reversal" is ineffective assistance. *Gross v. State,* 371 Md. 334, 350, 809 A.2d 627 (2002). We have already explained that, had the issue been preserved, the Supreme Court's pronouncement in *Rochin* would have mandated reversal.

### III. The Prejudice Prong

We must now examine Evans's evidence under the prejudice prong of *Strickland.* Although the Court of Appeals recognized in *Redman v. State,* 363 Md. 298, 768 A.2d 656, *cert. denied,* 534 U.S. 860, 122 S.Ct. 140, 151 L.Ed.2d 92 (2001), that some prejudice may be presumed, we conclude that the actions of Evans's trial counsel did not give rise to such a presumption. 363 Md. at 311–13, 768 A.2d 656. Instead, Evans is required to show actual prejudice.

Although the prejudice prong is an "imposing obstacle," Evans has satisfied his burden under the prejudice prong of *Strickland. See State v. Dowdell,* 73 Md.App. 172, 186, 533 A.2d 695 (1987). We find that Evans's prejudice is three fold. First, we are satisfied that, because of the nine extra vials of cocaine, Evans's sentence was enhanced by at least five years.

Had the State been permitted to proceed only on the actual transaction that occurred between Evans and Officer Rowell, the court would have merged the possession with intent to distribute conviction with the distribution conviction. *See Hankins v. State,* 80 Md.App. 647, 658, 565 A.2d 686 (1989) (concluding that when a possession with intent to distribute charge and a distribution charge arise from the same transaction, the convictions merge). Clearly, an extended sentence for counsel's failure is prejudicial under the *Strickland* analysis. *See Glover v. United States,* 531 U.S. 198, 204, 121 S.Ct. 696, 148 L.Ed.2d 604 (2001).

Second, as we have articulated in detail above, trial counsel's argument for suppression was extremely strong. Furthermore, had the trial court refused to suppress the nine extra vials of cocaine, we would have likely reversed and remanded for a new trial, without the extra vials. Such a strong argument for suppression, lost because of trial counsel's deficient performance, is prejudice. *Gross,* 371 Md. at 350, 809 A.2d 627.

Finally, if evidence of the nine vials was suppressed, only one transaction would have been at issue. Such circumstances place the credibility of the officer and Evans in a completely different perspective. With only the one transaction and no other vials of cocaine to support the officer's testimony, the jury reasonably could have reached a different conclusion. More likely than not, that is a situation the nine vials foreclosed.

**JUDGMENT OF THE CIRCUIT FOR BALTIMORE CITY REVERSED.**

**MAYOR AND CITY COUNCIL TO PAY COSTS.**