857 A.2d 1132

STATE of Maryland

v.

Barbara Ann PETERSON.

No. 1670, Sept. Term, 2003.

Court of Special Appeals of Maryland.

Sept. 13, 2004.

Ann N. Bosse (J. Joseph Curran, Jr., Atty. Gen. on the brief), Baltimore, for Appellant.

Lisa J. Sansone, Roland Walker, Baltimore, for Appellee.

Panel: DEBORAH S. EYLER, PAUL E. ALPERT (Ret'd, Specially Assigned), ANDREW L. SONNER * (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, Judge.

On November 23, 1992, a jury in the Circuit Court for Caroline County found Barbara Ann Peterson, the appellee, guilty of first degree murder, second degree murder, battery, and the use of a handgun in the commission of a felony. The court sentenced the appellee to life imprisonment for first degree murder and a consecutive 20 year term for the handgun conviction. The other convictions were merged for sentencing. The convictions were affirmed on direct appeal by this Court. *Peterson v. State,* 101 Md.App. 153, 643 A.2d 520, *cert. denied,* 336 Md. 559, 649 A.2d 602 (1994).

On January 27, 2003, the appellee filed a petition for postconviction relief. The circuit court held an evidentiary hearing, and thereafter, on August 14, 2003, issued a memorandum

---

\* Sonner, J. participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

opinion and order granting the petition and ordering a new trial. The State applied for leave to appeal that decision, which we granted.

The State presents two questions for review, which we have rephrased:

I. Did the post-conviction court err in finding that trial counsel's performance was constitutionally deficient because he either failed to investigate battered spouse syndrome or abandoned evidence of the syndrome in putting on a defense?

II. Did the post-conviction court err in finding that trial counsel's performance was constitutionally deficient because he failed to call the appellee to testify at trial?

For the following reasons, we answer the first question "No," and on that basis shall affirm the order of the post-conviction court. Because of our disposition of Question I, it is not necessary to address the issue raised in Question II.

## FACTS AND PROCEEDINGS

The appellee and Loren Peterson ("Loren") became romantically involved in 1964. They married on September 10, 1965. The appellee had one child, Anne Marie, from a prior relationship. The appellee and Loren went on to have four children together: Loren, Charles, Helen and Joseph.

Loren was in the military for 22 years of the parties' marriage. He was a Navy SEAL, assigned to the special services. In 1967 and 1968, he was overseas, serving in Vietnam.

The couple moved frequently and lived in many states, including Ohio, New York, Virginia, Delaware, and California. Loren retired from the military sometime in the late 1980's. In 1989, the couple moved to Maryland and settled in Marydel, in Caroline County. They lived on a rural property, and kept animals such as chickens, geese, and rabbits in their yard.

On Sunday, November 17, 1991, at about 2:00 p.m., the appellee shot and killed Loren, as he was sitting in a chair in their living room, watching television. Afterward, she went to her daughter Anne Marie's house, which was nearby, and called the police. She was arrested and charged with first degree murder and other related offenses. A lawyer with the Office of the Public Defender was assigned to represent her ("trial counsel").

The appellee and trial counsel met three times before trial. Trial counsel filed on the appellee's behalf a plea of "Not Criminally Responsible" ("NCR") due to insanity, under Md. Code (1990 Repl.Vol.), sections 12–108 and 12–109 of the Health–General Article ("HG").[1]

Trial commenced on November 13, 1992. The appellee did not contest the issue of criminal agency, that is, that she was the person who shot and killed Loren. She pursued the affirmative defense of NCR.

Carole Kleinman, M.D., a psychiatrist, testified as a defense expert witness at trial. Before trial, she had performed a psychiatric evaluation of the appellee that included interviewing her and her children. At trial, Dr. Kleinman opined that, at the time of the shooting, the appellee was suffering from "bi-polar mixed disorder with psychotic features and dissociative disorder not otherwise specified." Dr. Kleinman testified that, during their interviews, the appellee and her children had revealed that the appellee had been physically and psychologically abused by Loren during their marriage. In Dr. Kleinman's opinion, the appellee's mental disorder led her to think, delusionally, that she had to take action against Loren; and the mental disorder seized control of her, so she was not able to conform her conduct to the requirements of the law. Dr. Kleinman opined that, when the appellee shot Loren, the appellee thought in her own mind that she was in imminent danger of being killed.

---

1. HG sections 12–108 and 12–109 have been recodified at Md.Code (2001), sections 3–109 and 3–110 of the Criminal Procedure Article, respectively.

Dr. Kleinman was not asked any questions by trial counsel (or the prosecutor) about "battered spouse syndrome." No reference to that syndrome was made during the trial.

The defense also called as an expert witness Dr. David Shapiro, a clinical psychologist. He testified that the appellee's psychological test patterns were similar to those of people with dissociative disorder, who experience events by depersonalization, that is, as if the events were happening to someone else.

The appellee did not testify in her own defense.

At the close of the evidence, defense counsel sought an instruction on imperfect self-defense, which would permit the jury to convict the appellee of voluntary manslaughter. The court declined to give the instruction, on the ground that it was not generated by the evidence.

The jurors deliberated and rejected the NCR defense. They found that the appellee had been suffering from a mental disorder at the time of the shooting. They did not find, however, that the disorder had rendered her unable to conform her conduct to the requirements of the law. As stated above, the jury found the appellee guilty of first degree murder, second degree murder, battery, and the use of a handgun in the commission of a felony.

On direct appeal, the appellee challenged the trial court's decision to deny an imperfect self-defense instruction. This Court rejected her argument and affirmed her convictions. *Peterson, supra,* 101 Md.App. at 159, 643 A.2d 520.

As stated above, on January 27, 2003, the appellee filed a petition for post-conviction relief. She alleged ineffective assistance by trial counsel. Her primary argument was that trial counsel had performed deficiently by not introducing factual and expert witness evidence to show that she was suffering from battered spouse syndrome at the time of the shooting.[2] The State filed an opposition to the petition.

---

2. The appellee also argued that trial counsel had failed, deficiently, to advise her of her right to testify; to call her as a witness on her own

The post-conviction court held an evidentiary hearing on July 15, 2003. The appellee testified and also called Dr. Kleinman as a witness. Trial counsel testified as a witness for the State. The entire trial transcript from the November 1992 trial was moved into evidence.

The appellee testified that, in their pre-trial meetings, she told trial counsel that Loren had abused her for almost the entire period of their relationship, from before they were married. This is the history the appellee said she recounted to trial counsel in advance of the trial:

When the appellee met Loren, he was an alcoholic who was drunk much of the time. She fell in love with him, and thought she could "be a Florence Nightingale," and get him to change. Before they were married, there was an incident in which he threw her on the hood of a car and beat her up, in front of her sister. She was "holding [her] skirt or dress down and holding him off with [her] one hand while he was beating [her] on the hood of the car."

After the appellee and Loren were married, he became very possessive and jealous. When she was pregnant with their first child, he kicked her in the stomach, "as hard as a football," and she was afraid she was going to lose the baby. Another time, he told her he wanted to "mess [her] face up . . . [so] nobody would look at [her]." After that, she would cover her face when he beat her up, to try to protect it. He would kick her, pull her hair, and smack her. Also, he would "play with her head," using tactics he had been taught in the military to "pick on her" and on their children. He would beat her or pick on her for no reason—"if the moon was full," "[i]f it rained and he was going someplace," "[i]f his job wasn't going good." During their 26½ year marriage, this happened on average two or three times a week.

---

behalf; to object to the introduction of evidence of post-*Miranda* warnings silence on her part; and to object to the admission of prejudicial hearsay evidence.

The appellee sought protection from the courts many times: "[T]oo numerous to ... count. I got tired of going, I wasn't getting no results. Nothing was happening. And things were getting worse." Once, a week after a judge in Virginia said he "don't want to see us back in his court for a year[,]" Loren knocked her off a barstool and left her unconscious.

In 1983, as the result of a request by a court in a domestic proceeding between the appellee and Loren, Loren was admitted voluntarily to a Veterans' Administration drug and alcohol treatment program in Philadelphia. He completed the program and never resumed drinking. For "a little bit" after that, Loren "stayed nice." "But then ... his personality came back ... [h]e stopped drinking but the ugliness was still there."

As noted above, the couple moved to Maryland in 1989. Sometime before the fall of 1991, the appellee stopped sleeping in the same bed with Loren, because he "didn't respect her" and because she "was scared." She slept on the couch.

About two months before the shooting, Loren "was very angry." He would intimidate the appellee by giving her looks: "[I]f looks could kill, I would have been dead." Then he threatened to kill her by "tak[ing][her] head off." The appellee was so frightened that she had diarrhea for 20 straight days, and lost so much weight that she "had two bones for a rear end" and her "ribs were showing." When the appellee complained that she was physically ill from Loren's threats, he responded that they were not threats, they were promises, and she "had better get [her] children to make [her] funeral arrangements."

For a few days after Loren threatened to kill her, the appellee left the marital home and stayed with her daughter Anne Marie, and then with her daughter Helen, who also lived nearby. She returned to the marital home because, when her children went to work and she was alone in their houses, she was afraid Loren would find her and hurt her. She figured she was "better off in [her] house because then [she] knew

when he was coming home. To [her] it was safe even though [she was] getting beat up."

In October 1991, Loren spent time watching the confirmation hearing for Justice Clarence Thomas, and in particular the testimony of Anita Hill. He was angry at Hill, because he did not think a woman should be making accusations against a man. Calling Hill a "B–I–T–C–H," he boasted to the appellee that he would kill Hill for $100. Over the course of the hearing, he became increasingly irate over Hill's willingness to publicly criticize Thomas, and insisted that he would kill Hill, for less and less money, until he said he would do it for free. The subtext of Loren's menacing comments, to the appellee's thinking, was that any woman who defies a man deserves to be killed.

Six days before the shooting, Loren threatened to rape the appellee because she would not sleep with him.

For chronological continuity, before recounting the appellee's post-conviction hearing testimony about the day of the shooting, we shall set forth some of the trial testimony of Dr. Kleinman; of Dr. Jennifer Sasscer–Burgos, a State rebuttal witness; and of some of the fact witnesses at trial, about the appellee's history, up to that day.

Dr. Kleinman testified, in pertinent part, about the information she obtained from the appellee and her children in her pre-trial interviews:

Well, I found the interview with the children to be extremely helpful. I learned from the children that [the appellee's] problems had started long ago. That this was really not something new. This was just the very end of an illness that began a long time ago. They described her as someone who would flip out of control and lose control very easily and then later not remember what she had said or what she had done. They described her as being a very strange person who would say and do strange things and would report strange experiences like these out-of-body experiences or seeing visions of God, of Jesus, or seeing her aunt and grandmother seated at the foot of God. Hearing God

tell her that, that—well, actually she would experience these things and then she would respond, God, take me if you will. I'm here for you.

The [appellee's children] said that she's seen ghosts in the past and reported that. She would have these experiences of ESP, extra sensory perception, where she would feel that she could predict something before it happened. Like she knew an uncle was going to die before she was told that he was dead. And there were a number of instances like that.

The [appellee's] children told me that she was someone who was very obsessed with her ideas and obsessed with religion. They describe her as someone who is very moody and mercurial. By that I mean someone's whose moods shifted a lot.

During th[e] conversation that I had with [the appellee's] children, they went through in great detail some of the things that they observed over the past four months prior to [the day of the shooting]. And I want to—I want to mention those in specific detail. [T]here had been earlier problems of violence in this family almost from the very beginning. The victim in this case was a very heavy drinker until about 1980. He had been a Seal [sic] in Vietnam and apparently had been quite violent before he went to Vietnam, but when he came back he was even more violent and he had even a more severe alcohol problem. And he would very freely threaten his children and he would threaten his wife. She reports being kicked in the stomach when she was pregnant. Being knocked unconscious. Knocked off of a bar stool. This was earlier in their marriage. The Family Court records substantiate that in 1982, in March, she went to the Court reporting that she had been shoved out the front door and her arms had been twisted and that she was afraid for her safety. And she said that her husband talked about the people that he had assassinated in the Navy and he threatened that he was going to kill her, too. . . .

And there was mental and physical abuse going on in the family . . . [The appellee] went back to court. This time—

this is 10/14/83, October 14th. Her husband was drunk, she said. She fears that he's going to sexually attack her daughter, Helen, like he did Ann Marie. And [the appellee] said that when Anne Marie was a teenager, he had told Anne Marie that it was okay for her to learn about sex from her stepfather. And this had upset Anne Marie very much. It had upset her mother and [the appellee] was very frightened that the same kind of thing was going to happen to Helen.... [After Loren sided with their son, Loren, Jr., in fights with the appellee, Loren] threw the mother out of her own house ... and ultimately went to Court to get admittance back to her own house. The records state that, as a result of this, [the appellee] agreed that [Loren] would go into alcohol treatment.... He did stop drinking after that and unfortunately, I don't believe that the violent outbursts stopped. There's another Court record in June—June 26, 1987—from the Family Court of Delaware that says that [Loren] is being accused of offensive touching of his wife. Pulling her hair and trying to choke her. And the record states that [Loren] was ordered not to orally or physically abuse his wife....

And then things started to escalate beginning in the Fall of 1991. And [the appellee] reported these things to me in my initial interview with her, some of them. But they were all corroborated by her children, and also by for example, [a telephone service technician who had conversations with the appellee while doing repair work at the Peterson home]. Around August 1991, [the appellee] became convinced that her husband was having an affair. She became—at other times she became convinced that he might be homosexual. That he was having a homosexual affair. Evidence for this was that she found some hairs in his underwear and some fecal stains in the wrong place and from that, she assumed that he had—was having a homosexual affair and he might have Aids [sic] and she refused to sleep with him.

In August, 1991, the son Charles witnessed his father push his mother to the floor and put his hands around her neck and Charles said that his mother was very fearful for

her life. And this is something she had told me earlier in our earlier interviews. In September, the victim to[ld] [the appellee] in front of her son, Charles: 'I'm going to kill you. I'm going to take your head off.' Uh, another statement that was made by [Loren] in front of other people was to tell [the appellee] to tell her children to make funeral arrangements for her. [The appellee] took these statements seriously and she became very, very frightened.

And in September of 1991, [the appellee] went to Anne Marie's and said that she needed [a gun she had purchased a few years earlier] now to protect herself and that she was very frightened for her own security. She stayed a couple of days with Anne Marie. Then she went to Helen's house and she hid her car because she was afraid her husband might find out where her car was. Where she was staying. At first—she apparently carries this gun around in a bag, but felt it wasn't accessible enough. She would even carry it to church with her. And came up with this idea of wearing this vest where she constructed pockets and so, beginning in September of 1991, she wore this vest all the time and would not take it off to sleep. As I understand it, she slept most of the time sitting in a chair in the living room. If she had to go to the bathroom or take a shower, she'd wear the vest into the bathroom, lock the door, take her shower, put the vest on again, go back out. She wore it day and night.

Dr. Kleinman further testified that the appellee told her that:

[Loren] started being abusive of some of their animals and told her he wanted to get rid of them and he started kicking cats and—this was different then [sic] the way he had behaved before toward their animals. [On] November 16, 1991, [Loren] threatened to go out and kill some deer. By that time [the appellee] was hearing these things as threats that he was going to come and get her. He would say things to her like, "It was his turn to put her out of her twenty-six (26) years of misery." When she would go out to feed the animals she would be afraid to stay in one place.

She would be hopping around all the time because she was afraid that she was going to be the target and then [Loren] would say that it had been a hunting accident. So a lot of these things were things that I heard from the children and putting them all together I came up with the diagnosis that I mentioned earlier.

Dr. Sasscer–Burgos, a psychologist, was assigned by the State Department of Health and Mental Hygiene to evaluate the appellee. She met with the appellee on two occasions, for a total of five hours, before trial, and conducted psychological testing on her. Dr. Sasscer–Burgos concluded that the tests showed no evidence of psychotic behavior or mental illness. She explained, however, that "[o]ne of the things that did show up on the tests [wa]s that [the appellee] . . . had at [the time of the shooting] been experiencing significant amounts of situational stress[,]" which was "not surprising" given that Loren had been making death threats against her. The threats had been made "in the presence of other people so it's not just [the appellee's] imagination thinking that he was threatening her. Other people heard this too. He had hurt her in the past."

In rebuttal to the NCR defense, Dr. Sasscer–Burgos opined that the appellee's conduct on the day of the shooting was not the product of a delusional thought process or mental illness. Rather, given that "there was certainly a history of violence in the family in the past," the appellee was not suffering from a "fixed false belief," *i.e.*, a delusion, but from a "fixed true belief." If the appellee believed that Loren was going to kill her, and there was evidence of abuse in their relationship to support that belief, "[t]hat makes it much less likely that it is an indication of a mental illness." In other words, given the history of abuse in the marriage, the appellee had reason to fear that Loren would harm her.

Janet Stevens, a friend of the appellee's, testified that in mid-October of 1991, in a telephone conversation, the appellee told her that Loren was making death threats against her on a daily basis. The appellee said she was afraid to eat, because

she did not know if he was tampering with her food. She was hiding food that she knew he would not have had access to in the trunk of her car, and eating that. On October 20, 1991, Stevens saw the appellee in person, and was shocked by her gaunt appearance. The appellee told her that Loren was going on a hunting trip, and that she was his target; he had "messed with her mind" to make her think that. Stevens saw that the appellee was wearing a vest with hand-sewn pockets in which she was carrying a gun and bullets. The appellee said she was carrying the gun and bullets day and night, for protection.

Thomas Phelps, a service technician for what then was C & P Telephone Company, testified that on a date in the middle of October 1991, he went to the Peterson house to install an extra telephone line. He had never met the appellee before. She spoke to him for 35 to 40 minutes straight, during which she was rambling, distraught, and crying. She told him her husband had been threatening her all the time: "[H]e was always telling her ... I'm going to get you. I can kill you any time I want. Nobody'll know. I know a thousand ways to do it." She said she had not slept in 18 or 19 days. She showed him the hand-sewn pocket she had made for her vest in which she was carrying a gun, and said she was scared. "She said she hoped she didn't have to use it, but if he came at her, she would use it." When Phelps returned to work later that day, he told his fellow employees: "[Y]ou can remember this name because you'll read about this ... something's going to happen here. It was just a time bomb."

We shall now return to the appellee's post-conviction hearing testimony. On direct examination, in response to questions about what took place on the day of the shooting, the appellee explained: "I woke up real depressed and I felt real weird on that day. And I, I knew I had to get out of the house. And I just had to get out of the house. I felt so strange. I just, just had to go, of course...." That morning, she was in the kitchen and Loren was outside taking care of the animals. She had asked him before not to start fires near the animals' cages, because the smoke could hurt the baby

animals. She saw that he had started a fire near the cages and (speaking through the kitchen window) told him to put it out. He replied that the smoke was not going to go in the cages. When she heard him, "as soon as he said it, it seemed like he moved the air because it blew the other way. It was like he had, it was crazy. Like he had control over that wind. And so I shut the window. I shut up. I figure okay it's not going in the cages now, no more."

Loren came back in the house, took a shower, and sat down in his recliner to watch a football game on television. She told him: "I'm going to Anne Marie's house. I have to get out. Because I woke up feeling crazy." She recounted what happened next:

> So [I] turned around and he had gone to church that morning and he went early. And I thought God, that's great. I'm glad. Maybe he's going to be good when he comes home. Maybe he's going to go to confession. I'm Catholic and he turned Catholic. Maybe he's going to go to confession and if you know no more problems. And so I said why are you going so early. He said I just want to go to church. So I thought to myself, good, he's probably going to go to confession. Before you go to church, you go to confession. I thought that's great. He's going to be better when he comes home. Well when we had this words about, about the animals and I got a little hurt about it because those babies are innocent. And I shut the window. Then he came in. I thought I got to get out of this house. And so I looked at my husband. I hadn't slept in the bed with him for about a year and a half because he said if he had a terminal illness he got a hit list. He's going to take care of everybody on the hit list. So I said well what do you mean. I said, terminal illness, you talking about AIDS because he was fixed but there was condoms in the drawer. But I didn't care because if he's bothering with somebody else, I don't have to worry about him bothering me. That's how I felt about it. Because he ain't going to have me. That, that's just how I felt. And so he says, well I say well am I on the hit list? So he said you'll find out when the

time comes. So with that I had, I looked at him the day that this happened. I looked at him with so much love, admiration. I told him, I don't know where it came from. And when, when I looked at him I wanted to go in between his legs, sit on the floor, put my hand up on his leg. It just looked lovely at his face. But I thought no, oh, God, I can't do that. Because if I do that he's going to want to con me into the bed and I don't know after a year and a half of not being with my husband, loving him, if I could you know, say no, we're not going to bed or something. I thought that made me weak. So I thought no I can't go over there. And so that's the first time in twenty-seven years I ever felt this feeling of admiration and love for my husband. So powering. So I thought well I'd better go to the bathroom because I got an hour and a half drive to my daughter in Delaware. And when I went in the bathroom and I was sitting on the toilet, it was a jar, like a water jar, like people in India maybe. . . .

The appellee was asked to clarify that it was at that point that she came out of the bathroom and shot her husband. She responded: "I seen all things around him and, and then, then I didn't see him no more." Counsel asked whether at that precise moment she felt she was in danger of death or grievous bodily harm. She answered:

I didn't know I had the gun in my hand let alone shoot him. There was none of that. I did not know I had the gun in my hand. All I did was see him and he disappeared and I heard my voice. I didn't know it was me. It was coming out, you're not going to kill me, you're not going to kill me, over and over again. And then he disappeared and that's when I heard a gunshot. And then I seen him again. And then he disappeared again. And ten feet away on my right side I heard more than one gunshot. So it was like I was watching television in slow motion, like that wasn't me that was doing it. And I didn't even know I had a gun in my hand or nothing.

The appellee testified that she told trial counsel all of this in their meetings before her trial. Also, in their meetings, trial

counsel raised the prospect of pursuing a defense based on battered spouse syndrome, saying the appellee was going to be "the first one in the State of Maryland to use that defense." In addition, trial counsel told the appellee she was going to testify at trial; she was encouraged by that because she wanted "to tell the truth" to the jury.

Dr. Kleinman's post-conviction hearing testimony was as follows. Before trial, she met several times with the appellee, and once with the appellee's children. She spent "around fifty hours working on the case" and that she had "many, many, many notes that [she] prepared, particularly around the battered woman syndrome where [she] had organized [her] thinking about the, the incidents that [she] felt supported that use of that term in the court." [3]

In performing her psychiatric evaluation of the appellee, Dr. Kleinman concluded that the appellee "had some psychiatric problems" that had been "exacerbated by this very abusive relationship and had colored the way she experienced her interactions with her husband." Specifically, she formed the opinion that the appellee was experiencing the symptoms of battered spouse syndrome, which "affected her thinking at the time that she shot her husband." Dr. Kleinman explained that "[the syndrome] interfered with [the appellee's] ability to deliberate, to premeditate and I felt that this was important information for the jury to hear when they considered the case." She had formed the opinion, based on the appellee's emotional make-up and long-standing psychological problems, and her having been abused by Loren, that at the time of the shooting she thought she was in imminent danger from Loren.

According to Dr. Kleinman, she explained her thinking to trial counsel before trial. She told him she was prepared to testify that the appellee was experiencing battered spouse syndrome. When she was called to testify at trial, however,

---

**3.** In the medical and scientific community, battered spouse syndrome is sometimes referred to as "battered woman's syndrome." *See* Md.Code (2002 Repl.Vol.), section 10–916(a)(2) of the Courts and Judicial Proceedings Article ("CJ").

trial counsel did not ask her any questions about battered spouse syndrome. She "didn't understand why" and "felt very sad about it because [she] felt that there was a lot of information the jury should have heard that they didn't get to hear."

As noted above, the entire transcript of the criminal trial was moved into evidence. In addition to the testimony we already have discussed, the following is relevant. When asked to give an example of the appellee's having experienced dissociation, Dr. Shapiro referred to the description she gave him of what happened immediately before and during the shooting:

> [S]he described that just prior to the shooting, she had gone into the bathroom and she had this experience of feeling a large jar sitting on her head and she said she saw all of the terrible things that her husband had done to her go into the jar. She—she indicated when—that she came out and her husband was sitting in the chair. She had this, essentially a hallucinatory experience of seeing things floating around his head. This again would be consistent with dissociation. Her description of the shooting itself as if it were in slow motion. Having a blank period of time in there. She said it was as if she was watching a movie. Like she were somehow separated off, distinct from, watching herself do something. This is a dissociative experience.

The trial transcript also included the testimony of Maryland State Trooper First Class John Bollinger, who responded to Anne Marie's house on the day of the shooting and spoke to the appellee. He testified that the appellee said she had fired the gun at her husband, but was not sure how many times, and that she had been in constant possession of the gun from about September 14 to the day of the shooting. Trooper Bollinger's recitation of what the appellee told him happened on the day of the shooting was as follows:

> She advised that at approximately 8:30 her husband went to church ... he returned home approximately 11:30 or Noon. The victim changed clothes and went outside to feed his animals. Came back in the residence for a short period of time. Then went back outside to do more yard work. The

victim had started a fire in the backyard near the animals. Mrs. Peterson asked him through the window to put the fire out. It was disturbing the animals. The victim stated it was not bothering the animals and kept it burning. Approximately 1:00 p.m., the victim came into the residence and turned on the television in the living room and began watching football. Sat in the recliner located in the left rear corner of the living room. Mrs. Peterson stated she had a revolver on her. She had the extra rounds in her pocket. She went to the bathroom just off the living room. Took the gun into her hand. Mrs. Peterson stated she don't know what happened to her in the bathroom, but she came out with the gun in her hand, pointed the gun at her husband and repeated you're not going to kill me.

Trooper Bollinger went on to testify that the appellee said she fired the gun, then fired it again because she was afraid, and that there was at least one misfire; and she then got her pocketbook and drove to her daughter's house. She did not remember how she got there, however.

The State called trial counsel as a witness at the post-conviction hearing. After giving his professional background and explaining how he had come to represent the appellee in her criminal case, he testified about his efforts to prepare her defense. He explained:

[B]efore I even spoke to [the appellee] ... people were sending me these cases of spousal abuse and I was reading them and I thought well maybe this would be the defense. And I went and talked to [the appellee] and, you know, that was the first question, one of the first questions I asked her and she said yes. Yes, he knocked me off a bar stool in Virginia. We used to live down there. Well maybe I really got something here. I said when did that happen. She said that happened like ten years before. I said, well, you know, let's get something a little more recent. You know, I mean I read these cases and they were on going [sic] spousal abuse what, where they were successfully used. And she said, oh well, after, after that he quit drinking and he really

hasn't been physically abusive. Well then of course I had to think about the insanity defense.

Trial counsel testified that he sought the opinion of Dr. Kleinman, and arranged for her to evaluate the appellee and to meet with her children. He attended Dr. Kleinman's meeting with the appellee's children. After the meeting, he consulted with Dr. Kleinman about pursuing the NCR defense. He decided to pursue NCR as the primary defense, with imperfect self-defense as a "back up," to reduce the charge to manslaughter if the appellee did not meet the "hard burden of insanity." Trial counsel believed that, at the time of the shooting, the appellee thought her husband was going to kill her.

At the same time that he testified about having decided to pursue imperfect self-defense as a "back up," trial counsel testified that he had decided not to introduce evidence of battered spouse syndrome. He made that decision, he explained, because the information he had obtained from the appellee was that the last incident of physical abuse had happened more than ten years prior; and Trooper Bollinger, he understood, was prepared to testify that the appellee told him the most recent incident of abuse was when Loren knocked her off the barstool. Trial counsel had asked the appellee whether Loren had threatened her, and she had responded only with "oblique references" to threats and "complain[ts]" of some things he said which she interpreted as "threats." Therefore, in trial counsel's assessment, battered spouse syndrome did not apply, because there was not a repetitive cycle of physical abuse. Also, pursuing battered spouse syndrome as a theory would detract from the NCR defense, which he thought was a strong one.

Trial counsel also explained that he did not present expert witness evidence of battered spouse syndrome because one of the State's experts was a leading authority on battered spouse syndrome. As part of his trial strategy, he decided to "sort of turn the tables on [the prosecutor] and to not go for something [the prosecutor] was prepared for." After the trial, the

prosecutor approached trial counsel and said he was surprised he did not "go with the spousal abuse being the prime defense."

Trial counsel was asked, but could not explain, how he intended to present proof in support of imperfect self-defense other than by presenting evidence that the appellee had been experiencing battered spouse syndrome at the time of the shooting.

After hearing closing arguments, the post-conviction court took the matter under advisement.

On August 14, 2003, the court issued a memorandum opinion and order granting post-conviction relief in the form of a new trial. The court explained that there was factual evidence showing that the appellee had endured twenty-seven years of extreme physical and psychological abuse by Loren. The appellee's family members could corroborate the history of abuse and "recent incidents of spousal abuse," *i.e.*, incidents not long before the shooting, including acts of violence and threats by Loren against the appellee. The court further found that trial counsel's investigation was "grossly deficient" if it did not reveal these facts, most of which were disclosed by the appellee and her children to Dr. Kleinman in interviews.

The court found that if trial counsel's investigation did reveal these facts, he performed unreasonably by abandoning a defense based on battered spouse syndrome. The court observed that evidence of battered spouse syndrome would have provided the foundation for the defense of imperfect self-defense, and Dr. Kleinman would have expressed an opinion that the appellee was suffering from battered spouse syndrome, had she been asked. In addition, the testimony of Dr. Sasscer–Burgos could have been used as support for a defense based on battered spouse syndrome.

The court rejected, as unpersuasive, trial counsel's testimony that his decision against introducing expert witness testimony about battered spouse syndrome was strategy-based.

Finally, the court found that trial counsel's deficient performance had prejudiced the appellee "to a degree that undermine[d] the Court's confidence in the fundamental fairness of her trial," and, but for those errors, the result of the trial would have been different.[4]

The State filed a timely application for leave to appeal the circuit court's decision, which, as noted above, was granted.

## DISCUSSION

### I.

Before we address the State's contentions, we shall discuss the legal background pertinent to understanding the issues raised in this case.

### a.

■ The Sixth Amendment to the United States Constitution guarantees all criminal defendants the right to the assistance of counsel.[5] *Strickland v. Washington,* 466 U.S. 668, 684–85, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Cronic,* 466 U.S. 648, 653–54, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). "[T]he right to counsel is the right to the effective

---

4. The court also concluded that trial counsel's performance had been deficient because he had not informed the appellee of her right to testify and had not called her to testify, despite her wishes to the contrary. It explained that, even if it accepted trial counsel's testimony that he informed the appellee of his strategic decision to not have her testify, and that she did not respond, that that conversation was insufficient to either inform the appellee of her right to testify or to constitute a knowing and intelligent waiver of that right. The court explained that because it was granting the appellee her requested relief, it was not going to decide the other issues she had raised in her post-conviction petition.

5. The Sixth Amendment provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const., amend. VI.

Article 21 of the Maryland Declaration of Rights provides, in pertinent part: "That in all criminal prosecutions, every man hath a right ... to be allowed counsel...." It also guarantees effective assistance of counsel. *Mosley v. State,* 378 Md. 548, 556, 836 A.2d 678 (2003).

assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771, n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). *See also Mosley, supra*, 378 Md. at 557, 836 A.2d 678 (noting that "[i]ntegral to [the right to counsel under Maryland law] is the right to effective assistance of counsel").

Under *Strickland, supra*, to prevail on a claim of a violation of the Sixth Amendment right to effective assistance of counsel, the petitioner must satisfy a two-pronged test: he must show that trial counsel's performance was deficient and that the deficient performance prejudiced the defense. 466 U.S. at 687, 104 S.Ct. 2052. *See also Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Mosley, supra*, 378 Md. at 557, 836 A.2d 678.

■■■■ To prove the performance prong of the *Strickland* standard, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Williams v. Taylor*, 529 U.S. 362, 390, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (quoting *Strickland, supra*, 466 U.S. at 687, 104 S.Ct. 2052). The evidence must show that counsel's representation " 'fell below an objective standard of reasonableness.' " *Wiggins, supra*, 539 U.S. at 521, 123 S.Ct. 2527 (quoting *Strickland, supra*, 466 U.S. at 688, 104 S.Ct. 2052). In this regard, " '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.' " *Id. See also Mosley, supra*, 378 Md. at 557, 836 A.2d 678.

■■■■ In assessing the performance prong of an ineffective assistance of counsel claim under the Sixth Amendment, a court will "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland, supra*, 466 U.S. at 689, 104 S.Ct. 2052. The court must be highly deferential in reviewing counsel's performance, in order to avoid " 'second-guess[ing] counsel's assistance.' " *Evans v. State*, 151 Md.App. 365, 373, 827 A.2d 157 (2003) (quoting *Strickland, supra*, 466 U.S. at 689, 104 S.Ct. 2052). Until proven otherwise, the court pre-

sumes that counsel's representation was professionally competent, and that it "derived not from error but from trial strategy." *Mosley, supra,* 378 Md. at 558, 836 A.2d 678. *See also Evans, supra,* 151 Md.App. at 373, 827 A.2d 157. In *Strickland,* the Court explained:

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690–91, 104 S.Ct. 2052. *See also Wiggins, supra,* 539 U.S. at 521–22, 123 S.Ct. 2527.

To satisfy the prejudice prong of *Strickland,* the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland, supra,* 466 U.S. at 694, 104 S.Ct. 2052. *See also Evans, supra,* 151 Md.App. at 373–74, 827 A.2d 157. The ultimate inquiry is whether "counsel's errors were so serious as to deprive [the petitioner] of a fair trial, a trial whose result is reliable." *Oken v. State,* 343 Md. 256, 284, 681 A.2d 30 (1996) (quoting *Strickland, supra,* 466 U.S. at 687, 104 S.Ct. 2052).

On appellate review of a decision by a post-conviction court, we will not disturb the court's first-level factual findings unless they are clearly erroneous. *Evans, supra,* 151 Md.App. at 374, 827 A.2d 157; *State v. Jones,* 138 Md.App. 178, 209, 771 A.2d 407 (2001). Whether trial counsel's performance was deficient under the standard established in

*Strickland* is a finding on a second-level mixed question of law and fact, on a constitutional issue. *Evans, supra,* 151 Md.App. at 374, 827 A.2d 157. *See also State v. Johnson,* 143 Md.App. 173, 190, 794 A.2d 654 (2002); *State v. Gross,* 134 Md.App. 528, 559–60, 760 A.2d 725, *aff'd,* 371 Md. 334, 809 A.2d 627 (2002). For that reason, we conduct our own independent appraisal of the issue, applying the law to the facts and determining *de novo* whether counsel's representation in a particular case violated the defendant's constitutional right to effective assistance of counsel. *Evans, supra,* 151 Md.App. at 374, 827 A.2d 157. *See also Cirincione v. State,* 119 Md.App. 471, 485, 705 A.2d 96 (1998). Likewise, the issue of prejudice is subject to *de novo* review. *Mendes v. State,* 146 Md.App. 23, 31, 806 A.2d 370 (2002).

### b.

 Maryland recognizes two forms of the defense of self-defense: perfect (or complete) self-defense and imperfect (or partial) self-defense. *State v. Marr,* 362 Md. 467, 472, 765 A.2d 645 (2001).

 "Perfect or traditional self-defense is a complete defense to a charge of criminal homicide 'and, if credited by the trier of fact, results in an acquittal.'" *Thomas v. State,* 143 Md.App. 97, 113, 792 A.2d 368 (2002) (quoting *Marr, supra,* 362 Md. at 472–73, 765 A.2d 645). The elements of perfect self-defense are:

(1) The accused must have had reasonable grounds to believe himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;

(2) The accused must have in fact believed himself in this danger;

(3) The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict; and

(4) The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

*Marr, supra,* 362 Md. at 473, 765 A.2d 645 (quoting *State v. Faulkner,* 301 Md. 482, 485–86, 483 A.2d 759 (1984)).

██ Imperfect self-defense consists of the same elements, except that the defendant need not have had an *objectively reasonable* belief that he was in apparent imminent danger of death or serious bodily harm from the assailant, requiring the use of deadly force. *Marr, supra,* 362 Md. at 473, 765 A.2d 645 (citing *Faulkner, supra,* 301 Md. at 500, 483 A.2d 759) (emphasis added). The defendant's belief can have been objectively unreasonable. He need only have had an honest, subjectively reasonable belief that he was in imminent danger of death or serious bodily harm and that the use of deadly force was necessary. *Burch v. State,* 346 Md. 253, 283, 696 A.2d 443 (1997); *Thomas, supra,* 143 Md.App. at 113–14, 792 A.2d 368. "In all other respects, the elements of the two doctrines are the same." *Burch, supra,* 346 Md. at 283, 696 A.2d 443.

██ A successful defense of imperfect self-defense does not result in an acquittal. It negates the element of malice in the crime of murder, however, and therefore reduces the offense to manslaughter. *Marr, supra,* 362 Md. at 474, 765 A.2d 645. The underlying reason for the reduction was explained by the Court in *Faulkner:* "Logically, a defendant who commits a homicide while honestly, though unreasonably, believing that he is threatened with death or serious bodily harm, does not act with malice. Absent malice he cannot be convicted of murder." 301 Md. at 500, 483 A.2d 759. Because the killing was committed without excuse or justification, however, the defendant is not entitled to an acquittal. *Id.*

### c.

Effective June 1, 1991, the General Assembly enacted legislation, codified at CJ section 10–916, governing the admissibility in certain trials of evidence that the defendant was suffering from battered spouse syndrome at the time of the crime.

1991 Md. Laws, ch. 337, § 1.[6] The battered spouse syndrome evidence statute defines battered spouse syndrome as "the psychological condition of a victim of repeated physical and psychological abuse by a spouse, former spouse, cohabitant, or former cohabitant." CJ section 10–916(a)(2). It provides, at subsection (b), that,

> [n]otwithstanding evidence that the defendant was the first aggressor, used excessive force, or failed to retreat at the time of the alleged offense, when the defendant raises the issue that the defendant was, at the time of the alleged offense, suffering from the Battered Spouse Syndrome as a result of the past course of conduct of the individual who is the victim of the crime for which the defendant has been charged, the court may admit for the purpose of explaining the defendant's motive or state of mind, or both, at the time of the commission of the alleged offense:
>
> > (1) Evidence of repeated physical and psychological abuse of the defendant perpetrated by an individual who is the victim of a crime for which the defendant has been charged; and
> >
> > (2) Expert testimony on the Battered Spouse Syndrome.

As the statute makes clear, battered spouse syndrome is not itself a defense to homicide and assault crimes. *Banks v. State*, 92 Md.App. 422, 429, 608 A.2d 1249 (1992). Rather, it is a psychological condition, evidence of which may have a bearing, in a given case, on the state of mind element of the defenses of perfect and imperfect self-defense, when they have been raised.

Recently, in *State v. Smullen*, 380 Md. 233, 844 A.2d 429 (2004), the Court of Appeals discussed at length the battered spouse syndrome evidence statute and the relationship between evidence of battered spouse syndrome and the defenses of perfect and imperfect self-defense. The Court was present-

---

**6.** Under CJ § 10-916(a)(3), evidence of battered spouse syndrome only may be admitted in cases charging first degree murder, second degree murder, manslaughter, the attempt to commit any of those crimes, or assault in the first degree.

ed with the general question whether Maryland recognizes "battered child syndrome," and, if so, the specific question whether the defendant, a teenager, had introduced sufficient foundational factual evidence to allow introduction of expert witness testimony that he was suffering from battered child syndrome when he shot and killed his father. The Court held that battered child syndrome is a recognized psychological condition in Maryland, but that the evidence presented at trial was legally insufficient to have allowed expert witness testimony that the defendant was suffering from that condition at the time of the shooting.

The Court cited and discussed the work of Dr. Lenore E. Walker, an academic and clinical psychologist usually credited with first describing what was then called "battered woman syndrome." Dr. Walker's operating definition of a "battered woman" is one "who is repeatedly subjected to any forceful physical or psychological behavior by a man in order to coerce her to do something he wants her to do without any concern for her rights." *Id.* at 253, 844 A.2d 429 (citing Lenore E. Walker, THE BATTERED WOMAN (1979); THE BAT-TERED WOMAN SYNDROME (1984); and *Battered Woman Syndrome and Self–Defense*, 6 Notre Dame J.L. Ethics & Pub. Pol'y 321 (1992)).

The Court explained, based on the writings of Dr. Walker, that the "battering cycle" of a battered spouse happens in three phases, which may vary in time and intensity: the " 'tension-building' phase, in which minor incidents of physical, sexual, or emotional abuse occur"; the "acute battering incident, in which the batterer 'typically unleashes a barrage of verbal and physical aggression that can leave the woman severely shaken and injured' "; and the "contrition stage, in which the batterer apologizes, seeks forgiveness, and promises to change." *Id.* at 253–54, 844 A.2d 429 (citing Hope Toffel, *Crazy Women, Unharmed Men, and Evil Children: Confronting The Myths About Battered People Who Kill Their Abusers, and The Argument For Extending Battering Syndrome Defenses To All Victims Of Domestic Violence*, 70 S. Cal L.Rev. 337, 349 (1996) (in turn citing Walker, THE BAT-

TERED WOMAN SYNDROME, *supra,* at 95)). "The essence of the syndrome is that this cycle repeats, and, indeed, Walker asserts that the syndrome does not exist unless it has repeated at least once." *Id.* at 254, 844 A.2d 429. Over time, the cycle becomes more intense, frequent, and violent, and the battered spouse, in a phenomenon termed "learned helplessness," becomes submissive, having come to believe that he or she lacks power to control the situation. *Id.* In addition, over time, the battered spouse develops a heightened ability to sense "the escalation in the frequency and intensity of the violence and thus becomes more sensitive to the abuser's behavior." *Id.* at 255, 844 A.2d 429.

The abuse victim's "learned helplessness" and heightened sensitivity to the abuser's behavior are "key aspect[s] in the purported relevance of the syndrome in a self-defense context." *Id.* at 254, 844 A.2d 429. "Learned helplessness" explains why the battered spouse does not leave the situation, or take some action against the abuser. "Heightened sensitivity" explains why the battered spouse may interpret as threatening conduct by the abuser that would appear non-threatening to others, a point that is especially pertinent to imperfect self-defense. In elaborating on this topic, the Court explained that battered spouse syndrome,

> is founded upon a repetitive and increasingly frequent and severe cycle of violence that creates a hypervigilance on the part of the defendant and attunes the defendant to recognize a threat of imminent danger from conduct that would not appear imminently threatening to someone who had not been subjected to that repetitive cycle of violence. It is the psychological response to that cycle of violence that helps explain why the defendant perceived a threat from objectively non-threatening conduct on the part of the victim and why, though *apparently* the aggressor, the defendant was actually responding to perceived aggression by the victim.

*Id.* at 270–71, 844 A.2d 429 (emphasis in original).

The battered spouse syndrome evidence statute thus allows a defendant who is raising the defense of self-defense to

introduce evidence of foundational facts showing "the requisite pattern of abuse" and, once the factual foundation is laid, to introduce expert witness testimony. *Id.* at 273, 844 A.2d 429. "The syndrome evidence would then play its proper role in explaining why and how, in light of that pattern of abuse, the defendant could honestly, and perhaps reasonably, perceive an imminent threat of immediate danger." *Id.*

### d.

The State challenges the post-conviction court's finding that trial counsel performed deficiently by not pursuing a defense based on battered spouse syndrome. Its argument is two-fold. First, it contends that the post-conviction court's decision that a defense based on battered spouse syndrome was generated by available facts was legally incorrect. Second, it contends that the post-conviction court's finding that trial counsel "either unreasonably abandoned or failed to investigate" a defense based on battered spouse syndrome was clearly erroneous.

### (i)

The State maintains that, in this case, there was no evidence available to the defense of the sort of "repetitive cycle of violence" that underlies battered spouse syndrome; and, for that reason, the necessary factual predicate for expert witness testimony that the appellee was suffering from battered spouse syndrome at the time of the crime did not exist. Without elaborating, the State argues that "[the appellee's] own description of events that occurred on the day of the shooting, and the thought processes that coincided with those various events ... does not a case of [battered spouse syndrome] make."

Whether there was evidence available for introduction sufficient to support a defense based on battered spouse syndrome is a question of law that we review *de novo*. *See Evans, supra,* 151 Md.App. at 374, 827 A.2d 157.

We disagree with the State. When the criminal trial took place, there was factual evidence available to trial counsel to make a predicate showing of a repetitive cycle of abuse, sufficient to support expert witness opinion testimony that the appellee was suffering from battered spouse syndrome at the time of the shooting.

We have set forth in considerable detail the factual evidence available at the time of the criminal trial. That evidence showed that from 1964 until 1983, Loren repeatedly and with increasing frequency engaged in acts of physical and emotional abuse of the appellee. Loren's active alcoholism was a contributing factor in these repeated abusive episodes. The violence was witnessed by the couple's children, and resulted in repeated court interventions.

The cycle of physical violence perpetrated by Loren on the appellee appears to have been disrupted for a while in 1983, when he admitted himself to an alcohol rehabilitation facility and stopped drinking. The cycle of psychological abuse— constant criticism, picking on the appellee, and threatening her with physical harm—continued, however. Court documents relied upon by Dr. Kleinman in her trial testimony in 1992 showed that, by June of 1987, Loren had resumed physically abusing the appellee. In those documents, the appellee accused Loren of pulling her hair and trying to choke her.

There was evidence that, in August 1991, three months before the shooting, there was another incident of physical abuse, witnessed by the couple's son Charles. In that incident, Loren pushed the appellee to the floor and put his hands around her neck.

The available evidence further showed that, by September 1991, Loren's psychological abuse of the appellee was intensifying and escalating in frequency. He threatened to kill the appellee by "taking her head off" and told her to have her children make her funeral arrangements. When the appellee tried to confront Loren about the threats, he responded with a higher level of threat, telling her that he was making "prom-

ises, not threats." In the same time period, Loren started exhibiting cruel behavior to the couple's animals, including baby animals that the appellee viewed as helpless.

There was available evidence that the appellee experienced serious physical manifestations of the extreme fear Loren's threats of physical violence produced in her. In addition, in an effort to protect herself from impending physical harm, she armed herself, going so far as to hand-sew pockets for a vest, in which she carried her gun and ammunition at all times.

During October, Loren made references to wanting to kill Anita Hill, whose role in the confirmation hearings on television that month he viewed as an example of a woman not properly complying with the dictates of a man. The appellee took Loren's expressed desire to kill Anita Hill as a further expression of his desire to hurt her. There was evidence that in that same month, Loren was threatening to kill the appellee on a daily basis, and taunting her with details about how he would carry it out. The appellee told her children, her friend Janet Stevens, and the telephone service man, who was a complete stranger to the situation, about the threats and her extreme fear. A few days before the shooting, Loren threatened to rape the appellee because she would not sleep with him.

On the day of the shooting, according to the appellee's version of the events, and according to what she told Trooper Bollinger, the appellee exclaimed as she fired the gun at Loren, "You're not going to kill me, you're not going to kill me!" Trooper Bollinger's testimony, and the appellee's own testimony at the post-conviction hearing, support a strong inference that the appellee was in fear of imminent harm from Loren when she shot him.

To be sure, the evidence about the domestic abuse in the Peterson family was not entirely uncontradicted. For example, as trial counsel testified at the hearing, Trooper Bollinger was prepared to testify that the appellee told him, upon arrest, that the last incident of physical abuse by Loren had happened in 1983. Nevertheless, there was ample evidence that,

if believed, formed the requisite factual foundation of a repeated pattern of abuse, at times physical and psychological, and at other times only psychological, to permit expert witness testimony about battered spouse syndrome. There were ebbs and flows in the pattern, and variations in the amount of time that elapsed between episodes of physical abuse. Nevertheless, the evidence available to the defense at trial was sufficient to draw a picture of years of repeated abuse that occurred in cycles; and that, in the months leading up to the shooting, there was one instance of physical abuse, in August, followed by escalating threats to kill, and ultimately to rape, that by November were a daily occurrence.

The State asserts that the Court's decision in *Smullen* supports its argument that the evidence in this case was insufficient to sustain a defense based on battered spouse syndrome. As we have discussed above, the Court in *Smullen* concluded that there was not a sufficient factual predicate for expert testimony about battered child syndrome. In reaching that conclusion, the Court focused on the absence of testimony or any other form of evidence to show that anyone ever had seen the defendant being assaulted by his father, or had seen any injuries from which one could infer that such an assault had happened. The Court observed that the people who lived in the household were in the best position to have seen any incidents of abuse, if there were any; and those family members testified, to the contrary, that there was no abuse. The only evidence in *Smullen* that could have supported a claim of abuse was testimony by one witness who had seen bruises on the defendant's forehead and elbow. That evidence was never connected to any conduct on the part of the victim, however. Thus, other than the bare allegations by the defendant, there was no evidence that the defendant had been physically or psychologically abused by the victim.

In the case at bar, unlike in *Smullen*, there was ample evidence from sources other than the appellee, including the couple's children, to show that for years the appellee suffered physical and psychological abuse by Loren; that

Loren physically attacked the appellee three months before the shooting, and thereafter made repeated threats that he was going to kill her, and a threat to rape her; and that she was consumed by the fear that he was going to cause her physical harm. The factual evidence available to the defense in this case was legally sufficient to allow expert witness testimony that the appellee was suffering from battered spouse syndrome at the time of the crime.

### (ii)

■ The State challenges as clearly erroneous the post-conviction court's finding that trial counsel's decision against pursuing a defense based on battered spouse syndrome was not a matter of strategy, and the court's finding that trial counsel "either unreasonably abandoned or failed to investigate" a defense based on battered spouse syndrome. The essence of the State's argument is that these were factual findings that were directly refuted by trial counsel's own testimony explaining that he made a strategic decision not to pursue a defense based on battered spouse syndrome.

In a claim alleging ineffective assistance of counsel, the question of whether counsel's representation was deficient is an ultimate issue that is a mixed question of law and fact; it is not a pure question of fact. *See Evans, supra,* 151 Md.App. at 374, 827 A.2d 157. For that reason, we review *de novo* the post-conviction court's finding that trial counsel performed deficiently by not pursuing a defense based on battered spouse syndrome, whether because he did not sufficiently investigate the facts of the case to know that such a defense was available, or whether he abandoned any such defense. We defer, however, to the post-conviction court's witness credibility determinations and first-level factual findings. *See Jackson v. State,* 141 Md.App. 175, 187, 784 A.2d 670 (2001). Like the post-conviction court, we engage a strong presumption that the decisions trial counsel made in representing the appellee derived from trial strategy, not from error, and fell "within the wide range of reasonable professional assistance." *Strickland, supra,* 466 U.S. at 689, 104 S.Ct. 2052.

In the case at bar, the post-conviction court's decision on the performance prong of *Strickland*, as it related to a defense based on battered spouse syndrome, rested on an implicit first-level factual finding that the facts that would support such a defense either were known to, or knowable by, trial counsel. The record bears out that implicit finding. Dr. Kleinman obtained most of the pertinent information from interviewing the appellee and her children before trial, and collecting court documents reflecting the Petersons' domestic history. There was evidence that trial counsel was present during the interviews. Corroborating witnesses were available and several testified at trial. We agree with the post-conviction court that any adequate investigation by trial counsel would have revealed that the appellee was for her entire marriage a victim of domestic abuse by Loren, both physical and psychological.

A defense lawyer acting competently may decide, as a matter of strategy, to pursue only one of two or more available defenses, when pursuing more than one defense could undermine any of them. In his hearing testimony, trial counsel offered that explanation for his decision not to examine Dr. Kleinman about battered spouse syndrome, and not to present evidence of the syndrome as part of the defense. At the same time, however, he said he had made the decision to pursue two defenses at trial—the NCR defense, and the "back up" defense of imperfect self-defense—and that he in fact did so in presenting the case. Thus, trial counsel acknowledged that the strategy he adopted during the trial was *not* to pursue a single defense.

What is apparent from trial counsel's testimony, and is critical to whether his decision not to present battered spouse syndrome evidence was a result of strategy or deficiency in representation, is that he did not appreciate that factual and expert opinion evidence that the appellee was experiencing battered spouse syndrome when she committed the killing was a necessary predicate to the defense of imperfect self-defense. It was undisputed that the shooting was "non-confrontational," not "confrontational," *see Smullen, supra,* 380 Md. at 257, 844

A.2d 429, in that it did not occur in the midst of a physical interaction between the appellee and Loren. The appellee shot Loren when he was sitting in a chair, watching television. She thus appeared to have been the first aggressor, a circumstance that, ordinarily, would prevent her from pursuing either perfect self-defense or imperfect self-defense. In addition, she appeared to have used force that was excessive, given that there was no confrontation, and did not retreat. *See Marr, supra*, 362 Md. at 473, 765 A.2d 645.

Under CJ section 10–916(b), however, notwithstanding evidence of having been the first aggressor, using excessive force, and failing to retreat, the appellee could have asserted that she was suffering from battered spouse syndrome at the time of the crime and introduced supporting factual and expert opinion evidence of that syndrome to show her state of mind and motive. The battered spouse syndrome evidence was relevant to whether, although the appellee appeared to have been the first aggressor (and to have used excessive force and not retreated), she was (and did) not; rather, years of physical and psychological abuse had made her hypervigilant to the threat of violence in what otherwise seemed to be non-threatening conduct by Loren. In addition, evidence that the appellee was suffering from battered spouse syndrome was relevant to whether, when she shot Loren, she had an honest albeit unreasonable belief that she was in imminent danger of death or bodily injury, another element of imperfect self-defense.

In opening statement, trial counsel predicted that the jury would hear evidence that the appellee had been abused by Loren throughout their marriage; and, as we have recounted, there was evidence adduced, both by the defense and the State, to show that a pattern of domestic abuse had prevailed in the marriage. Yet, trial counsel did not raise the issue of battered spouse syndrome, and did not attempt to elicit expert opinion testimony from Dr. Kleinman, that the appellee was suffering from battered spouse syndrome at the time of the shooting, when Dr. Kleinman was of that opinion. And without battered spouse syndrome evidence, there was no founda-

tion for the defense of imperfect self-defense. It was for that reason that the trial court declined to grant an instruction on the defense of imperfect self-defense. That decision was upheld on appeal by this Court, in an opinion noting that the defense had *not* sought to introduce evidence of battered spouse syndrome. *Peterson, supra,* 101 Md.App. at 155, 643 A.2d 520.

The evidence before the post-conviction court thus supported a finding, with which we concur, that trial counsel did not understand that his "back up" defense of imperfect self-defense only could be presented to the jury upon the introduction of evidence of battered spouse syndrome. When trial counsel failed to introduce that evidence, the defense was kept from the jury, in a ruling that was legally correct. The decision not to introduce battered spouse syndrome evidence was not a product of trial strategy; it was a consequence of trial counsel's not being adequately familiar with the law. For this reason in particular, we agree with the post-conviction court that trial counsel's representation of the appellee was ineffective under constitutional standards. *See United States v. Span,* 75 F.3d 1383, 1389–90 (9th Cir.1996) (holding that a claim of "trial strategy" will not protect counsel's performance from Sixth Amendment challenge when the "strategy" resulted from a misunderstanding of the law); *Redman v. State,* 363 Md. 298, 310, 768 A.2d 656 (2001) (concluding that counsel's performance was deficient because he was unaware of the Maryland constitutional right of removal in capital cases).

If trial counsel had introduced factual and expert opinion evidence of battered spouse syndrome, which was available and which he knew or should have known was available, the defense of imperfect self-defense would have been generated, and would have been presented to the jury to decide. It is reasonably probable that, if that defense had been decided by the jury, the result of the proceeding would have been different. Accordingly, the post-conviction court properly concluded that trial counsel's deficient performance prejudiced the appellee's defense.

598

## II.

As stated above, our disposition of the first question presented renders a decision on the second question presented unnecessary.

**ORDER AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**